Shannon Liss-Riordan (SBN 310719)
sliss@llrlaw.com
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:    (617) 994-5800
Facsimile:    (617) 994-5801

Attorneys for Plaintiffs White Coat Captioning, LLC, YES Consulting, LLC, Autumn Communications, Inc., Business Training Works, Inc., Measuring Usability LLC, and Foster & Forge Ltd. on behalf of themselves and all others similarly situated

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| WHITE COAT CAPTIONING, LLC, YES CONSULTING, LLC, AUTUMN COMMUNICATIONS, INC., BUSINESS TRAINING WORKS, INC., MEASURING USABILITY LLC, AND FOSTER & FORGE LTD. on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>X CORP. (FORMERLY KNOWN AS TWITTER, INC.)<br><br>Defendant | Case No. 3:23-cv-1594-SK<br>*Assigned to the Honorable Sallie Kim*<br><br>**MOTION FOR CLASS CERTIFICATION**<br><br>DATE:    April 20, 2026<br>TIME:    9:30 a.m.<br>CTRM:    C – 15th Floor<br><br>Complaint Filed:    April 4, 2023<br>Trial Date:    November 10th, 2026<br><br><br>REDACTED |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on February 23, 2026, that Plaintiffs will and hereby do move this Honorable Court to certify a class action. Plaintiffs file this motion pursuant to Fed. R. Civ. P. 23. The motion is based on this Notice of Motion, the Memorandum of Points and Authorities in support thereof submitted herewith, the Declaration of Shannon Liss-Riordan and exhibits thereto, submitted herewith, and such other filings and arguments that may be submitted for the Court's consideration, as well as all documents and records on file in this matter.

Dated: February 23, 2026

WHITE COAT CAPTIONING, LLC, YES CONSULTING, LLC, AUTUMN COMMUNICATIONS, INC., BUSINESS TRAINING WORKS, INC., MEASURING USABILITY LLC, and FOSTER & FORGE LTD., on behalf of themselves and all others similarly situated,

By their attorneys,

 /s/ Shannon Liss-Riordan
Shannon Liss-Riordan (SBN 310719)
sliss@llrlaw.com
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Tel: (617) 994-5800
Fax: (617) 994-5801

MOTION FOR CLASS CERTIFICATION

**TABLE OF CONTENTS**

I. Introduction ............................................................................................................... 1

II. Factual Background ................................................................................................... 3

    A. Twitter's Vendor Payment Process Prior to Acquisition by Elon Musk ................................................................................................... 3

    B. Elon Musk Acquires Twitter and Freezes All Outgoing Payments ................................................................................................... 4

    C. Musk Eliminates Any Expense That He or His Team Determines is Not "Critical," Regardless of Prior Commitments and Contractual Obligations ............................................... 5

    D. Twitter Never Bothers to Process Nearly a Thousand Outstanding Invoices ............................................................................. 9

    E. Plaintiffs and the Other Vendors Whose Invoices Were Not Paid Suffered from Twitter's Mass Breach of Contract .......................... 10

III. Legal Standard ....................................................................................................... 12

IV. Argument ................................................................................................................ 13

    A. The Proposed Class Satisfies Rule 23(a)'s Prerequisites ......................... 13

        1. Numerosity ................................................................................... 13

        2. Commonality ................................................................................ 14

        3. Typicality ..................................................................................... 15

        4. Adequacy ..................................................................................... 16

        5. Ascertainability ........................................................................... 16

    B. The Proposed Class is Maintainable Under Rule 23(b)(3) ....................... 17

    C. Any Attempt by Twitter to Devise *Post Hoc* Rationales for Declining Individual Invoices Cannot Defeat Class Certification ............................................................................................. 19

V. Conclusion ............................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
731 F.3d 952 (9th Cir. 2013) ...................................................................................... 14

*Amchen Prod., Inc. v. Windsor*,
521 U.S. 591 (1997) .................................................................................................... 17

*Cellphone Termination Fee Cases*,
193 Cal. App. 4th 298 (2011) ..................................................................................... 20

*Del Monte Props. & Invs., Inc. v. Dolan*,
26 Cal. App. 5th Supp. 20 (Cal. App. Dep't Super. Ct. 2018) ................................... 20

*General Telephone Co. of Southwest v. Falcon*,
457 U.S. 147 (1982) .................................................................................................... 15

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ..................................................................................... 17

*Harris v. Palm Springs Alpine Ests., Inc.*,
329 F.2d 909 (9th Cir. 1964) ....................................................................................... 13

*In re Univ. of S. California Tuition & Fees COVID-19 Refund Litig.*,
2023 WL 6453814 (C.D. Cal. Sept. 29, 2023) ........................................................... 17

*James v. Uber Techs. Inc.*,
338 F.R.D. 123 (N.D. Cal. 2021) ........................................................................... 13, 16

*Johnson v. City of Grants Pass*,
72 F.4th 868 (9th Cir. 2023) .................................................................................. 13, 14

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) ....................................................................................... 12

*Munguia-Brown v. Equity Residential*,
2019 WL 3779523 (N.D. Cal. Aug. 12, 2019) ........................................................... 20

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) ....................................................................................... 15

*Pulaski & Middleman, LLC v. Google, Inc.*,
802 F.3d 979 (9th Cir. 2015) ....................................................................................... 21

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) .................................................................................. 15, 16

*Stiefel & Co. v. Blitz*,
   1993 WL 526386 (S.D.N.Y. Dec. 14, 1993) ...........................................................................20

*True Health Chiropractice Inc. v. McKesson Corporation*,
   332 F.R.D. 589 (N.D. Cal. 2019)............................................................................................13

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) .................................................................................................12

*Villalpando v. Exel Direct Inc.*,
   303 F.R.D. 588 (N.D. Cal. 2014)............................................................................................13

*Wang v. Chinese Daily News, Inc.*,
   737 F.3d 538 (9th Cir. 2013) .................................................................................................14

*Yokoyama v. Midland Nat. Life Ins. Co.*,
   594 F.3d 1087 (9th Cir. 2010) ...............................................................................................21

**Rules**

Fed. R. Civ. P. 23 ........................................................................................................passim

## I. INTRODUCTION

This case was brought against X Corp. (formerly known as Twitter, Inc.) ("Twitter") as a result of Twitter's failure, following Elon Musk's acquisition of the company in October 2022, to pay pending invoices from hundreds of vendors that had provided goods or services to Twitter. (2d Am. Compl., ECF No. 37). Plaintiffs White Coat Captioning, LLC, YES Consulting, LLC, Autumn Communications, Inc., Business Training Works, Inc., Measuring Usability LLC, and Foster & Forge Ltd. (collectively Plaintiffs), individually and on behalf of all others similarly situated, seek to recover the amounts owed to them under the doctrines of breach of contract and related common law theories.

After Mr. Musk acquired Twitter, he and his deputies made very clear their commitment to ruthlessly and dramatically cut expenses at all costs. They decided that Twitter should only pay what was "critical" to keeping Twitter afloat. They terminated most of the company's employees within a few months, rampantly canceled contracts with vendors, and ignored invoices from vendors for work already performed whose services, in their view, were not "critical."

Simply put, in their haste to slash expenses at all costs, Mr. Musk and his deputies ignored Twitter's preexisting legal commitments. The company terminated vendor contracts willy nilly, regardless of whether the terms allowed for early termination. And it typically terminated contracts "effective immediately", despite the required notice periods in the contracts. Twitter's employees were well aware that these actions violated the company's legal obligations, but as Janet Kim, who did business strategy and operations for Twitter's Procurement, explained, Mr. Musk and his leadership team urged them not to worry about that—instead, telling them vendors can "sue" if they want to be paid. (Exhibit 50 at 66.)

Twitter applied this same cutthroat approach to outstanding invoices due for work that vendors already had completed. ███████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

1

MOTION FOR CLASS CERTIFICATION

████████████████████████████████████████████████████████████████
██████████████████████████████████████████████.

Many of these invoices had already been approved for payment, but Twitter froze outgoing payments en masse and required that all payments be personally approved by Mr. Musk or one of his deputies.

As a result, nearly ████████ invoices totaling ███████████████ remain unpaid today. These invoices were neither paid nor rejected, but were simply ignored. Plaintiffs and other vendors asked Twitter, repeatedly, why they were not getting paid. They too were ignored, receiving automated responses or no response at all. These ████████ of vendors—Plaintiffs and putative class members—are in the same position. More than three years later, they have outstanding invoices with Twitter for work already completed, which Twitter has never disputed and yet has not paid.

These vendors' claims are well suited to proceed as a class action. They clearly satisfy Rule 23's numerosity requirement. There are common issues of law and fact, as the same series of events described above caused all their invoices to go unpaid. The named Plaintiffs had the same experience as other class members, satisfying the typicality requirement, and Plaintiffs and their counsel are vigorously pursuing this case and are well versed in class litigation, satisfying the adequacy requirement. The class is ascertainable, as the outstanding invoices from the relevant time period are easily identified in Twitter's records. The common issues also predominate over individualized issues. Twitter is liable to all members of the class as a result of a single course of action: its blanket failure to process and pay their invoices, which was a business tactic applied wholesale and not the result of any deficiency in any individual class member's performance under their contract.

While Twitter will argue that the class should not be certified due to individualized invoice issues, it can only provide *post hoc* rationalizations that played no actual role in Twitter's failure to pay vendors' invoices. Indeed, the evidence is clear that Twitter did not carry out *any* process of reviewing these invoices and making individualized determinations regarding whether the invoices correctly billed for goods provided or services performed.

2

A class action is also the superior method of prosecuting this case because it would not be feasible or just to require each of these hundreds of vendors to bring suit individually, and indeed, many of them would not have the resources to do so.  Denying class certification would therefore deprive them of access to justice altogether.  Twitter should not be permitted—after breaching its contracts by the hundreds through a single course of action—to escape accountability by inventing individualized issues after the fact.

Thus, Plaintiffs hereby move to certify a class comprised of all Twitter vendors who provided goods or services to Twitter, submitted invoices to Twitter between August 1, 2022, and February 1, 2023, whose invoices Twitter either approved or did not dispute at the time they were submitted and are now past due, and who have not received payment from Twitter.

Because this proposed class qualifies for class treatment under Rule 23, the Court should certify the class and appoint Plaintiffs as the class representatives and Plaintiffs' counsel as class counsel.

## II.   FACTUAL BACKGROUND

### A.  Twitter's Vendor Payment Process Prior to Acquisition by Elon Musk

Before Elon Musk acquired Twitter, the company had hundreds of active contracts with various businesses that provided goods or services to Twitter.[1] Vendors worked closely with employees at Twitter in the departments utilizing the vendors' services, who served as points of contact and were referred to, within Twitter, as the vendors' "business owners".[2] After vendors

---

[1]   For instance, Plaintiff White Coat Captioning provided real-time captioning services for events, conferences, meetings, and classes (Exhibit 52 at 10); YES Consulting provided leadership coaching and consulting (Exhibit 49 at 20); Autumn Communications provided public relations and marketing services (Exhibit 56 at 16); Business Training Works provided soft skills training to Twitter employees (Exhibit 60 at 12-13); Measuring Usability conducted a study and produced a report on Twitter's user experience (Exhibit 57 at 16); and Foster & Forge designed educational courses for Twitter employees. (Exhibit 59 at 14).

[2]   *E.g.* Exhibit 57 at 195-98; Exhibit 58 at 265 (describing "lengthy discussions" about what Twitter wanted, explaining that work was "done closely in conjunction with Twitter"), Exhibit 49 at 61-63, 81 ("constant communication" between Twitter and Plaintiff, including weekly one-on-one meetings to review work and get feedback).

MOTION FOR CLASS CERTIFICATION

completed their work, they would either submit invoices by email to a Twitter inbox or through a web portal, as Kristena Bravo, who ran Twitter's Accounts Payable team (the team responsible for issuing payments on invoices), explained. (Exhibit 46 at 21, 27-28). The invoices would be automatically entered into Oracle, Twitter's central accounting platform, and the Oracle platform would send the "business owner" a request to either approve the invoice (verifying that the vendor delivered the goods or services) or reject it. (Exhibit 46 at 21-23; Exhibit 50 at 42-43, 142; Exhibit 51 at 31-32, 142-43).[3]

Jennifer Liu, who was a Senior Procurement Analyst, testified that prior to Mr. Musk's acquisition of the company, if Twitter had an issue with a vendor's performance, it never simply rejected an invoice with no notice to the vendor; instead, someone at Twitter would discuss the issues with the vendor, and however an issue was resolved, the outcome would be reflected in Twitter's financial records on Oracle. (Exhibit 46 at 31-32; Exhibit 51 at 119-20).

**B. Elon Musk Acquires Twitter and Freezes All Outgoing Payments**

Elon Musk acquired Twitter on October 27, 2022. (Exhibit 1).  To help him run Twitter, Musk assembled a team of loyal deputies who had helped him with his other business pursuits. Prominent among them were Jared Birchall, who runs Musk's family office and Steve Davis, the CEO of The Boring Company (a tunnelling company Musk founded and owns).[4] (Exhibit 45 at 7, Exhibit 46 at 46-47, Exhibit 48 at 9-10, Exhibit 50 at 53-55, Exhibit 53 at 25-27).

---

[3]    Twitter paid the invoices when they were due, and Twitter's Accounts Payable team was responsible for triggering payment by the due date. (Exhibit 46 at 21-23; Exhibit 50 at 42-43; Exhibit 51 at 26). All of Twitter's outgoing payments were recorded in its financial system. (Exhibit 46 at 29-30).

[4]    Several years after Musk's acquisition of Twitter, Musk enlisted Steve Davis as the effective leader of the Trump administration's "Department of Government Efficiency" ("DOGE"), in which he oversaw a similar effort to massively slash expenses at all costs; indeed, Musk has compared Davis' cost-saving measures to chemotherapy, explaining "Steve is like chemo ... A little chemo can save your life; a lot of chemo could kill you." Ryan Mac, Kate Conger, and Theodore Schleifer, Meet Elon Musk's Top Lieutenant who Oversees DOGE, March 20, 2025. (Exhibit 2)

MOTION FOR CLASS CERTIFICATION

Musk's team immediately sought to slash Twitter's expenses.[5] ███████████ ███████████████████████████████████. (Exhibit 3). Implementing this directive, Ms. Bravo directed the Accounts Payable team to escalate only "critical" payment requests to her if needed. (*Id.*, Exhibit 4, Exhibit 53 at 98-99, Exhibit 45 at 13, Exhibit 46 at 48-49, Exhibit 50 at 70-72, Exhibit 51 at 109-110).

This pause, ordered by Mr. Musk's team, applied even where vendors had completed work and Twitter "business owners" had already approved payment. Indeed, these invoices were scheduled to be paid—and, in the normal course, would have been paid—when they came due.[6] (Exhibit 46 at 21-24.) But all of these vendors were in the same boat: payments to them were immediately frozen.

**C. Musk Eliminates Any Expense That He or His Team Determines is Not "Critical," Regardless of Prior Commitments and Contractual Obligations**

After Musk acquired Twitter, his team engaged in several methods of radical cost-cutting, all of which affected vendors.

First, Musk laid off thousands of Twitter employees, comprising at least seventy percent of the company's workforce. (Exhibit 53 at 26, 34; Exhibit 46 at 49-50, 78-79; Exhibit 47 at 48-50). This mass layoff caused knowledge and personnel gaps that made it "impossible" for

---

[5] ███████████████████████████████████████████ (Exhibit 45 at 10-11, 40-41, Exhibit 53 at 98, 102-03). ███████████████████████ (Exhibit 53 at 24-25) ████████████████████████████████████. *Id.* at 22. ████████████████████████████████████████████████████████████████████. (Exhibit 53 at 21-23, Cheung at 68-69). At the same time, advertising revenue was "dropping off a cliff" █████████████████████████ █████████████████████████. (Exhibit 53 at 24, Exhibit 54 at 83-84, 162, 198-99).

[6] A spreadsheet sent to Jared Birchall on Friday, October 28, 2022 (the day after the acquisition) identified $133 million of unpaid invoices in Twitter's system. (Exhibit 5). Payments of those invoices were paused. That included multiple invoices associated with the named Plaintiffs, as well as hundreds of others. *See* Exhibit 6 (six invoices for White Coat Captioning, LLC totaling $34,919.23; four invoices for Business Training Works, Inc. totaling $24,000; one invoice for Measuring Usability, LLC totaling $33,887; and one invoice for YES Consulting, LLC totaling $18,000.

remaining Twitter staff to know whether there was any reason not to pay a vendor's invoice. (Exhibit 46 at 49-50).

Second, ███████████████████████████████ ████████. (Exhibit 48 at 41-43). ██████████████████████ ██████ (Exhibit 8).[7] ████████████████████████████████ ██████████████████████████ (Exhibit 48 at 41-43). ████████████████ ████████████████████████████████████████████████████ ████████████████████████. *Id.*[8] To assess contracts for cancellation, Musk's team had Twitter employees on its "Strategic Sourcing" team, directed by Martin O'Neill, ████████████████ of the services that Twitter was using. (Exhibit 54 at 72-74, 148-55).[9]

Many of Twitter's contracts with its vendors did not allow Twitter to simply terminate a contract for convenience. Nonetheless, Musk's team required Twitter employees to cancel contracts regardless of whether the agreement allowed for termination for convenience. Janet Kim and Jennifer Liu, Twitter employees who worked with Mr. O'Neill and Ms. Bravo, were among the employees tasked with carrying out these cancellations. (Exhibit 50 at 176-80, 182; Exhibit 51 at 79-80, 83-89, 123-24; Exhibit 10).[10] ████████████████████████████

---

[7] ████████████████████████████████████████████████████████████████, Martin O'Neill, Twitter's head of Strategic Sourcing, was instructed to cut a quarter of Twitter's total spending in one or two weeks; he relayed that instruction to his team. (Exhibit 50 at 51-55).

[8] Twitter maintained contracts with vendors who provided what was deemed to be "mission critical" goods or services (Exhibit 54 at 54): typically, technology companies (Exhibit 54 at 98-99, Exhibit 50 at 93-94) or other vendors whose work was necessary to "keep the lights on" at Twitter (Exhibit 51 at 68). Employees received top-down guidance from Musk's team that "[w]e need to make sure that we retain the suppliers who keep the platform afloat; the others, terminate." (Exhibit 50 at 82-83).

[9] Four of the named plaintiffs appear on this spreadsheet (Exhibit 9) and are identified as vendors whose contracts would be cancelled: White Coat Captioning (at 57, line 1458); YES Consulting (at 356-57, line 2513); Measuring Usability (at 66 line 1710 and at 284-85, line 1901); and Foster and Forge (at 47 line 1175 and at 420-21 line 2925).

[10] This work was carried out by Martin O'Neill and his team; the █████████████ ████████████████████████████████████████████ (Exhibits 12-13

6

████████████████████████████████████████████████

██████████████████████████ (Exhibit 11). Twitter gambled that vendors "would be reluctant to upset the Elon Musk family of companies" by pushing back. (Exhibit 51 at 126).[11]

Third, in the midst of this mass vendor contract cancellation project, Twitter simply did not pay past due invoices from vendors who were not being kept on. Indeed, Musk's team required all payment requests to go through Musk or one of his close advisors, who only approved "critical" invoices—just as they only retained "critical" vendors and "critical" employees. (Exhibit 46 at 52-53; Exhibit 51 at 92-93). ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ (Exhibit 44 at 40-41.) ██████████████████

███████████████████████████████████████████

██████████████████████████████ (Exhibit 17, Exhibit 46 at 86-89).

██████████████████████████████████████

(Exhibit 45 at 15-17)—██████████████████████████████████

---

(██████████████████████████████████████), Exhibit 14 ██████████████████

██████████████████████), Exhibit 55 at 54-67).

████████████████████████████████████████████████ (Exhibit 15).

██████████████████ (*See also* Exhibit 16, ██████████

████████████████████.

[11] Employees who were forced to carry out this work of canceling contracts in breach of the agreements felt such strong ethical qualms about what they were being asked to do that they left Twitter a few weeks after Musk acquired the company. (Exhibit 50 at 183, Exhibit 51 at 131-32). Later, when offered the opportunity to return to Twitter, Ms. Kim told Mr. O'Neill that she would only return if she "would have nothing to do with the supplier-facing work that was happening." (Exhibit 50 at 185). By this, she meant "all of the work that I thought was unethical or illegal"—i.e. the nonpayment of invoices and illegal termination of contracts. (*Id.* at 185). However, Mr. O'Neill did not accept her conditions, and Ms. Kim did not return to Twitter. (*Id.*)

7

3:23-cv-1594-SK

███████████████████████████████████████████████████████████████████

█████████████████████████████████████ *Id.* at 66-67.[12]

Notably, the calculus of what invoices to be paid was not determined by whether the services or goods had been provided as required by the vendors' contracts, but instead whether Musk's team determined that the payment was "important" to the company. (Exhibit 17, Exhibit 45 at 66-67; Exhibit 46 at 52-53; Exhibit 51 at 92-93). ██████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████. (Exhibits 21-22, Exhibit 45 at 75-76, 91-92). ████

███████████████████████████████████████████████████. (Exhibits 23-24).[13] █████████████████████████████████████

███████████████████████████████████████████████. (Exhibit 17, Exhibit 46 at 94).  Rather, after the acquisition, "Twitter was not going to voluntarily give them [the vendors] money" and they "would have to sue to get it." (Exhibit 50 at 66).

Many of the Twitter employees who may have urged vendors to be paid according to their contracts were terminated (or left) within weeks of Musk's acquisition of the company.[14] Musk and his team fostered an environment that discouraged employees from advocating for

---

[12] ████████████████████████████████████████████████████████████████

██████ (Exhibit 18). ████████████████████████████████████████████████ (*Id.*) ██████████████████████████████████████████████ Exhibit 19. █████████████████████████████████████████████████████████████████ (Exhibit 54 at 199-200; Vol. II at 81-84), ███████████████████████ (Exhibit 19). ██████████████████████████████████████████████████ (Exhibit 20).

[13] ██████████████████████████████████████████████████ . (Exhibit 7).

[14] ████████████████████████████████████████████████████ Exhibit 46 at 119, 121-22; Exhibit 7).

MOTION FOR CLASS CERTIFICATION

payment of vendors pursuant to their contracts. Employees understood Musk only cared about "critical" expenses and that he or a member of his inner circle would be personally reviewing each expense. (Exhibit 51 at 129, 139).  In the midst of more than 70% of the company's workforce being laid off (or being forced out), employees were afraid of drawing Musk's disapproval by urging payment of what Musk's team deemed to be "noncritical" expenses. *Id.*

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████. (Exhibit 25). ███████████████

██████████████████████████████████████████████zed. (Exhibit 45 at 88-89).[15]

### D. Twitter Never Bothers to Process Nearly a Thousand Outstanding Invoices

In total, ███ **invoices** submitted by approximately ███ vendors to Twitter between August 1, 2022, and February 1, 2023, were never paid; those invoices total more than ████ ███. (Exhibit 7).  While Twitter paid some other invoices on an *ad hoc* basis (based primarily on Musk's team's determination of which were "critical" to pay, ***notably not whether the goods or services were provided – as there was no mechanism or process in place to actually determine that*** (Exhibit 46 at 49; Exhibit 54 at 65-69, 107-10; Exhibit 48 at 35-37, 51-54; Exhibit 51 at 123; Exhibit 50 at 197), █████████████████████████ █████████████████████████████.[16]

---

[15] █████████████████████████████████████████████████████ ███████████████████████████████." *See, e.g.,* Exhibit 26 (██████ ██████); Exhibits 27-28 ████████ ███). ███████████████████████. Exhibit 46 at 54-55).

[16]    Twitter produced this spreadsheet from its Oracle database, which was used to create its financial statements. (Exhibit 50 at 46). Mr. O'Neill emphasized that each and every invoice was entered into Oracle because "that's an area where we really could not afford to not have compliance for audit purposes." (Exhibit 54 at 39). In other words, the data can be presumed to be accurate. ███████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████. Exhibit 46 at 112-14). █████████████████████████████ ██.

Twitter has produced no evidence to explain why Plaintiffs' invoices, or any others on this spreadsheet, were never paid.  It has produced no evidence showing that Plaintiffs (or any of the other putative class member vendors on this spreadsheet) failed to perform pursuant to the terms of their contracts.  Moreover, no witness was able to identify any process that was in place to assess, *before this litigation*, whether vendors had performed under their contracts. While Ms. Bravo suggested that the freeze on "non-critical" payments was temporary in order to allow the company to validate the invoices (Exhibit 46 at 48-49), "there was never mention that the reason [Twitter was] pausing payments was to revalidate invoices." (Exhibit 50 at 195). Indeed, no witness could confirm that Twitter *actually carried out* any review of the paused payments.[17]

### E.  Plaintiffs and the Other Vendors Whose Invoices Were Not Paid Suffered from Twitter's Mass Breach of Contract

As a result of the conduct described above, Twitter simply ignored the invoices from Plaintiffs and hundreds of other vendors. Each Plaintiff completed work for Twitter, and Twitter failed to pay each of them.[18] Plaintiffs contacted Twitter repeatedly to ask when they would be paid. (Exhibit 35). They received automated responses that the invoices were "pending additional review," or no response at all. (*Id.*). ███████████████████████

---

[17]    Ms. Bravo acknowledged that it was theoretically her team's responsibility "to go through all of the items in aging"—that is, invoices coming due or overdue—"to ensure that all of that review had been performed." Exhibit 46 at 49). But she did not testify that her team actually did that.  Instead, she acknowledged that doing so was "impossible" because the workload was far beyond what her team could handle, especially after the massive cuts to the company and the breakdown of Oracle's process for automatically routing invoices to the required approvers.  In short, Ms. Bravo did not complete the process herself and was not able to identify anyone else who did. *Id.*

[18]    ████████████████████████████████████ (Exhibit 29); ████████████ (Exhibit 30); ███████████ (Exhibit 31); ███████ (Exhibit 32); ████ (Exhibit 33); ██████████████ (Exhibit 34).

3:23-cv-1594-SK

MOTION FOR CLASS CERTIFICATION

█████████████████████████████ (Exhibit 36).  On the rare occasion a Plaintiff was able to get a response from a point of contact who had not been laid off, it was only to offer apologies and say, "I don't have insight as to when invoices will be processed." (Exhibit 37). ████████████████████████████████████████████████████████████████████████████████. (Exhibit 38). Plaintiffs could also see this status through Twitter's vendor portal. (Exhibit 39). ████████████ ████████████████████████████████████████████████████ ██████████████████████ (Exhibit 7). Plaintiffs never received explanations, and Twitter never paid.[19]

The other vendors, who are putative class members in this case, suffered this same conduct as well.  Generally, Musk's team determined that they did not provide critical services to Twitter or that they simply did not need to pay them – without having done any analysis as to whether the goods or services had been provided and thus whether they should be paid. Exhibit 7 ████████████████████████ ██████████████████████████████ ████████████████████████████. *Id.* ████ ██████████████████████████████ ██████████. *Id.* ████ ██████████████████████████████ ████. *Id.* ████ ████████████████████████

As a result after Musk's acquisition of the company, Twitter did not pay them. ██ ████████████████████████████████ ████████████████████████████

---

[19] ██████████████████████████ ████████████████████████████ ██████ (Exhibit 38 at XPROD00006027-28).

MOTION FOR CLASS CERTIFICATION

3:23-cv-1594-SK

██████████████████████████████████████████████████████████

(Exhibit 40). █████████████████████████████████████, [20] *see id.,* ████████████

███████████████████████████. (Exhibit 7).

It is clear that Twitter (prior to Musk's acquisition) regarded Plaintiffs and putative class members as having performed on their contracts and thus entitled to payment, but after Musk's acquisition, Twitter simply failed to pay them, while not conducting any analysis regarding any legitimate reason for failing to pay them. The reality after the acquisition was that "Twitter was not going to voluntarily give them money" and the vendors "would have to sue to get it." (Exhibit 50 at 66).

In sum, Twitter owes Plaintiffs, and the hundreds of other vendors in the purported class, the payments due for the goods or services they provided to Twitter. For the reasons discussed below, Plaintiffs' claims for breach of contract or, in the alternative, under the theories of quantum meruit, accounts stated, and open book account, should be certified as a class action under Rule 23.

## III.    LEGAL STANDARD

Rule 23 provides two steps for certifying a class action. Fed. R. Civ. P. 23. First, plaintiffs must establish the four prerequisites of Rule 23(a). *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Courts refer to these prerequisites as "numerosity, commonality, typicality and adequacy of representation." *See, e.g.*, *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). More recently, some courts have also required a

---

[20] ██████████████████████████████████████████████████████ Exhibit 46 at 134-35, 141). ██████████████████████████████████████████████████████████ (Exhibit 41). ████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Indeed, members of the Accounts Payable team sometimes forwarded Plaintiffs' inquiries to a member of the Accounting department. (Exhibit 38). But aside from one instance where the Accounting employee responded to the Plaintiff—with the exact same language used in automated responses about the invoices "pending additional review" (Exhibit 42)—there is no evidence she took any action.

MOTION FOR CLASS CERTIFICATION

showing that the class is ascertainable. *James v. Uber Techs. Inc.*, 338 F.R.D. 123, 130 (N.D. Cal. 2021).

Next, Plaintiffs must show that the proposed class is proper under Rule 23(b). *Johnson v. City of Grants Pass*, 72 F.4th 868, 885 (9th Cir. 2023). A class is proper under Rule 23(b)(3) when "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

## IV. ARGUMENT

Plaintiffs seek to represent a class of Twitter vendors who provided goods or services to Twitter, who submitted invoices for these goods or services during the period from August 1, 2022 to February 1, 2023, whose invoices Twitter either approved or did not dispute at the time they were submitted and are now past due, and who have not received payment from Twitter for these services. See 2d Am. Compl., ECF No. 37, at 13.

As discussed below, Plaintiffs' proposed class satisfies Rule 23(a)'s prerequisites and is proper under Rule 23(b)(3).

### A. The Proposed Class Satisfies Rule 23(a)'s Prerequisites

#### 1. Numerosity

To satisfy the numerosity requirement a proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[I]mpracticability does not mean impossibility, but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964). "There is no specific number of class members required." *Johnson*, 72 F.4th at 885. However, "[c]ourts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members." *True Health Chiropractice Inc. v. McKesson Corporation*, 332 F.R.D. 589, 606 (N.D. Cal. 2019) (*quoting Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 605-06 (N.D. Cal. 2014)).

MOTION FOR CLASS CERTIFICATION

Between August 1, 2022, and February 1, 2023, ▮ vendors submitted invoices (▮ in total) for goods or services provided, which remain unpaid today. (Exhibit 7). Thus, Plaintiff's proposed class is numerous enough under Rule 23(a).

### 2. Commonality

"A class satisfies Rule 23's commonality requirement if there is at least one question of fact or law common to the class." *Johnson*, 72 F.4th at 887 (citing *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013)). In assessing commonality, courts ask whether the putative class claims "depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke." Abdullah v. U.S. Sec. Assocs., Inc., 731 F.3d 952, 957 (9th Cir. 2013) (internal quotations omitted).

The requirement of commonality, under Rule 23(a)(2), does not require all questions of fact and law to be common. *Id.* "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.*

Plaintiffs and the putative class members have common claims: breach of contract, quantum meruit, account stated, and open book account. These claims arise from a common factual predicate: Twitter's blanket decision, after Elon Musk's acquisition, not to pay vendors for work they had completed pursuant to contracts with Twitter. Plaintiffs will demonstrate that Twitter instructed its employees not to pay invoices as a cost-cutting measure, without regard to vendors' performance pursuant to their contracts or for Twitter's own contractual obligations. Moreover, Twitter's failure to pay these invoices was *not* based on any analysis at the time of whether the goods or services had been performed under the vendors' contracts.  Under Musk and his deputies, the attitude was that only vendors they deemed "critical" would be paid, and the others could simply sue the company if they wanted to be paid. (Exhibit 46 at 52-53; Exhibit 51 at 92-93).

These factual issues are common to all members of the proposed class, thus satisfying Rule 23(a)'s commonality requirement.

MOTION FOR CLASS CERTIFICATION

### 3. Typicality

Typicality asks whether "the claims or defenses of the representative parties are typical" of the class. Fed. R. Civ. P. 23(a)(3). Typicality is a "permissive standard[ ]." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citation omitted). Courts consider whether class members have the "same or similar injury" caused by "the same course of conduct." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (citation omitted). "Thus, typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Id.* (cleaned up).

As the Supreme Court recognized in *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982), Rule 23(a)'s commonality and typicality requirements "tend to merge." 457 U.S. at 157 n.13. "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.*

Plaintiffs and the putative class members suffered the same injury—non-payment for goods or services performed—resulting from the same course of conduct—Twitter's failure to pay invoices to hundreds of vendors as a post-acquisition cost-cutting measure (not an analysis of which invoices had properly been submitted). Each Plaintiff provided goods or services to Twitter pursuant to a contract, submitted an invoice (or several invoices) to Twitter for goods provided or work performed shortly before or shortly after Elon Musk's acquisition of Twitter, and never received payment. None of the Plaintiffs received any explanation or justification for Twitter's refusal to pay; indeed, as former Twitter employees made clear, their failure to be paid was simply the result of an effort by Twitter to cut its costs drastically (and occurred in the midst of Twitter's knowing plans to shirk its contractual responsibilities). As discussed above, Plaintiffs will show that putative class members not only suffered the same injury but also were treated the same way: their invoices went unpaid, without explanation or justification, as part of Twitter's mass cost-cutting effort. Thus, the proposed class meets Rule 23(a)'s typicality standard.

MOTION FOR CLASS CERTIFICATION

### 4. Adequacy

Adequacy of representation is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Representation is adequate if: (1) the class representative and counsel do not have any conflicts of interest with other class members; and (2) the representative plaintiff and counsel will prosecute the action vigorously on behalf of the class. *Staton*, 327 F.3d at 954.

There is no evidence of conflicts among Plaintiffs, their counsel, or the proposed class. Plaintiffs and their counsel have been prosecuting the class claims vigorously. (Liss-Riordan Decl.). Plaintiffs' counsel is a law firm that is well known for its prosecution of class actions. *Id.* Indeed, Plaintiffs' counsel, Attorney Shannon Liss-Riordan, has received widespread national recognition for her work prosecuting class actions and was named last year by *Forbes* as one of the top 200 lawyers in the country, one of the few plaintiffs' class action lawyers on the list. *Id.* Plaintiffs and their counsel are, therefore, adequate representatives under Rule 23(a).

### 5. Ascertainability

"To be ascertainable, the definition of the class must be definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member before trial, and by reference to objective criteria." *James*, 338 F.R.D. at 130 (internal quotation marks and citation omitted). "Put differently, the Court must identify the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the 'best notice practicable' in a Rule 23(b)(3) action." *Id.* (cleaned up).

Members of the proposed class are readily identifiable from ███████████ ███████████████████████████████████████████████ ████████████████████████. (Exhibit 7). Those records also include information sufficient for notice under Rule 23(c)(2). The ascertainability requirement is therefore satisfied here.

MOTION FOR CLASS CERTIFICATION

**B. The Proposed Class is Maintainable Under Rule 23(b)(3)**

"In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class certification must also show that the action is maintainable under Fed. R. Civ. P. 23(b)(1), (2), or (3)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (citing *Amchen Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). Two conditions must be met to maintain a class under Rule 23(b)(3). First, "questions of law or fact common to class members [must] predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Second, "a class action [must be] superior to other available methods for fairly and efficiently adjudicating the controversy. *Id.*

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Windsor*, 521 U.S. at 623. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022 (9th Cir. 1998) (citation omitted); *see also In re Univ. of S. California Tuition & Fees COVID-19 Refund Litig.*, 2023 WL 6453814 (C.D. Cal. Sept. 29, 2023) (certifying class of implied contract claims because students had received same promise of in-person education, albeit from different sources).

Plaintiffs assert that they were subject to a blanket decision by Twitter not to pay outstanding invoices following Mr. Musk's acquisition of the company (other than those deemed "critical" by Musk and his deputies) – without any analysis of whether the invoiced goods or services had been provided or performed. This issue is the same for all members of the proposed class. Although different vendors had different contracts with Twitter, there are no genuine issues of contract interpretation that would predominate over the common issues,

In assessing superiority, courts consider: (1) the interest of each member in "individually controlling the prosecution or defense of separate actions"; (2) the "extent and nature of any litigation already begun"; (3) the "desirability or undesirability of concentrating the litigation of the claims"; and (4) the "likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

MOTION FOR CLASS CERTIFICATION

Here, all four factors weigh in favor of a class action. First, most class members have not brought their own case, which shows there is not a widespread interest in class members controlling their claims individually. And many members of the proposed class are small businesses that do not have the resources to bring separate actions. [21]

Second, as noted, very few (████) class members have brought their own individual litigation over these claims. ████████████████████████ (Exhibit 43), ████████████████████████████ ████████████████████████████ ███.

Third, this lawsuit has been ongoing for several years and the parties have conducted extensive discovery, such that it would be far more economical to allow additional plaintiffs to join this lawsuit rather than requiring them to initiate ████ of separate lawsuits and repeat much of the same discovery in each one. It is thus highly desirable to concentrate the litigation of the claims. Indeed, for most vendors, an individual lawsuit would not be worth the time and expense of bringing it. Thus, denying these vendors a class action will deny them access to justice altogether, when many of the businesses were (similarly) very badly injured by Twitter's actions. These businesses should be able to seek damages from Twitter to compensate them for the losses they suffered, and denying them that right because they lack the resources to bring individual actions would be a severe injustice.

Fourth and finally, any difficulties of managing this class action are vastly outweighed by the benefits discussed above. Namely, a class action will allow the parties and the Court to avoid resolving common issues hundreds of times and will ensure that potential class members

---

[21] ████████████████████████████████████
██████████████████████████████████████
██████████. (Exhibit 7.) ██████████████████
████████████████████ *Id.* ██████████████

18

have access to justice following Twitter's blatant disregard for their contractual rights. Assessing individual damages will not be burdensome, as the amounts owed are readily ascertainable from the invoices submitted to Twitter.

### C. Any Attempt by Twitter to Devise *Post Hoc* Rationales for Declining Individual Invoices Cannot Defeat Class Certification

Plaintiffs expect that Twitter will argue that common questions of law and fact do not predominate because contractual obligations and performance will vary among the vendors. As it did in taking Plaintiffs' depositions, Twitter likely will attempt to engage in *post hoc* criticism of individual vendors' contractual performance in an attempt to justify its failure to pay, and then argue that these individualized issues defeat class certification. Such an argument, however, would simply be a post hoc justification for Twitter's refusal to pay vendors, disconnected from the facts described above and ignoring how Twitter actually conducted its business. This argument fails for several reasons.

First, it is not necessary that *all* issues be common to all Plaintiffs, but only that common questions are a "significant aspect" such that resolving them once (rather than hundreds of times in separate actions) is far more efficient. Here, there are clearly significant common questions as discussed above. The core issue is whether Twitter made a wholesale decision not to pay vendor invoices for work already completed, and this question is common to all class members. Further, the witness testimony and other evidence described here relate to the common issues – such as testimony from the individuals who worked at Twitter and carried out the instruction not to pay outstanding invoices – and will be the same for the hundreds of potential class members. Accordingly, the predominance requirement is satisfied.

Further, any attempt by Twitter to allege individualized performance issues amounts to a post hoc justification that should be rejected. Twitter's sudden failure to pay hundreds of vendors was obviously not the result of deficient performance by all those vendors. Indeed, Plaintiffs' evidence—including testimony from Twitter's employees who were involved in the process of terminating vendors (Exhibit 50 at 176-80, 182; Exhibit 51 at 79-80, 83-89, 123-24)

██████████████████████████████ (*e.g.*, Exhibits 17, 21-24)—demonstrate that Twitter was not considering contractual performance when it decided not to pay the outstanding invoices. Many of the invoices had already been officially approved for payment, showing that before Musk's acquisition, Twitter had affirmatively accepted the vendors' performance under the contracts – and Twitter has no evidence to show that, at the time, it failed to pay the invoices based upon its dispute that those invoices were valid. Indeed, Twitter will not be able to present any contemporaneous evidence that any alleged deficiencies in vendor performance were identified at the time it decided not to pay vendors, let alone that any such deficiencies played a role in that decision.

In similar contexts, courts have rejected defendants' attempts to justify a baseless action using a post hoc rationalization. For instance, courts have repeatedly explained that a party to a contract cannot impose liquidated damages for another party's breach unless it conducted a contemporaneous analysis of the actual losses resulting from that breach "prior to setting the amount." *See, e.g.*, *Munguia-Brown v. Equity Residential*, 2019 WL 3779523, at *3 (N.D. Cal. Aug. 12, 2019) (citing *Del Monte Props. & Invs., Inc. v. Dolan*, 26 Cal. App. 5th Supp. 20, 24 (Cal. App. Dep't Super. Ct. 2018) (citing *Cellphone Termination Fee Cases*, 193 Cal. App. 4th 298, 327 (2011))). "Post-hoc rationalization" for the amount of liquidated damages "will be rejected." *Id. See also Stiefel & Co. v. Blitz*, 1993 WL 526386, at *4 (S.D.N.Y. Dec. 14, 1993) (rejecting defendant's attempt to retroactively point out minor technical issues in a contractor's performance to justify terminating contract, because these issues were "nothing more than *post hoc* rationalizations" and defendant "never previously asserted that any of them constituted breaches of contract").

The same logic applies here. Twitter withheld payment on more than ██ invoices submitted by more than ██ vendors without any contemporaneous attempt to justify the legality of doing so. At the time that it refused failed to pay the vendors, Twitter did not identify issues with their performance, nor did it communicate with vendors about alleged deficiencies. Twitter certainly never determined that any vendor's supposed shortcomings justified failing to pay *one hundred percent* of any invoice (rather than pointing out issues and paying the invoice

20

partially). Any reasons that Twitter invents, at this stage, should be rejected as *post hoc* justifications which should not be allowed to defeat class certification.

Indeed, even if Twitter were now able to retroactively take issue with individual vendors' performance, such issues would not predominate and would not justify withholding the entire amount owed to any vendor – nor the denial of class certification, when Plaintiffs have evidence that a common wrong occurred. Any defects in vendors' past performance will not change the fact that Twitter simply breached its contracts, smug in its assurance that most vendors would not bring legal action (either because they could not afford it, or because it was not worth it for the amount involved). As Ms. Kim noted, Twitter's attitude under Musk was that the vendors could simply "sue" if they wanted to be paid. (Exhibit 50 at 66.)

Moreover, at most, any shortcomings that Twitter may establish in any individual vendor's performance could simply reduce the amount of damages owed that vendor, not justify non-payment altogether. In the Ninth Circuit, it is settled law that that "damage calculations alone cannot defeat certification." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986 (9th Cir. 2015) (citing *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)). This is true even where the damages calculations involve "highly individualized and fact-specific determinations." *Id.* (quoting *Yokoyama*, 594 F.3d at 1093). In *Yokoyama*, the Ninth Circuit reaffirmed this rule even though the damages for *every single individual* involved a highly complex analysis of factors:

> [T]he amount of damage sustained by a single class member would depend on factors such as the financial circumstances and objectives of each class member; their ages; the [indexed annuity products (IAPs)] selected; any changes in the fixed interest rate for that particular IAP; the performance of the selected index; any changes in the index margin for that particular IAP; any cap on the indexed interest; the length of the surrender periods; whether the individual had undertaken or wanted to undertake an early withdrawal of funds; any benefit the individual policy holder derived from the form of the annuity itself, including the tax-deferral of credited interest; and the actual rate of return on the IAP.

*Id.* at 1093-94. Here, by contrast, each vendor's damages are readily ascertainably from the submitted invoices. To the extent that Twitter wishes to argue that some vendors did not

21

perfectly perform under the contracts and are not entitled to full payment, that does not make the calculation of damages any more burdensome than in many other class actions, like *Yokoyama*, where *every* class member required a highly intensive individual damages calculation.

In sum, any *post hoc* rationale Twitter may devise to defend its refusal to pay vendors should be rejected. Even if the Court were to consider whether individual vendors' performance could potentially offset the damages owed, that is not enough justification to defeat class certification under *Yokoyama* and its progeny.

For these reasons, the Court should certify Plaintiffs' proposed class under Rule 23(b)(3).

**V.    CONCLUSION**

For the foregoing reasons, the Court should certify this case as a class on behalf of all Twitter vendors who provided goods or services to Twitter, submitted invoice August 1, 2022, and February 1, 2023, whose invoice(s) Twitter either approved or did not dispute at the time they were submitted and are now past due, and who have not received payment from Twitter.

Dated: February 23, 2026

Respectfully submitted,

WHITE COAT CAPTIONING, LLC, YES CONSULTING, LLC, AUTUMN COMMUNICATIONS, INC., BUSINESS TRAINING WORKS, INC., MEASURING USABILITY LLC, and FOSTER & FORGE LTD., on behalf of themselves and all others similarly situated,

By their attorneys,

 /s/ Shannon Liss-Riordan
Shannon Liss-Riordan (SBN 310719)
sliss@llrlaw.com
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Tel: (617) 994-5800
Fax: (617) 994-5801

22

## CERTIFICATE OF SERVICE

I, Shannon Liss-Riordan, hereby certify that a true and accurate copy of this document was served on counsel for Defendant X Corp. via the CM/ECF system on February 23, 2026.

*/s/ Shannon Liss-Riordan*
Shannon Liss-Riordan

23

3:23-cv-1594-SK

MOTION FOR CLASS CERTIFICATION