J. Jonathan Hawk (SBN 254350)
jhawk@mcdermottlaw.com
Erica Lang (SBN 340330)
Elang@mcdermottlaw.com
Ari Swazer (SBN 359884)
Aswazer@mcdermottlaw.com
**MCDERMOTT WILL & SCHULTE LLP**
2049 Century Park East
Suite 3200
Los Angeles, CA 90067-3206
Telephone: +1 310 277 4110
Facsimile: +1 310 277 4730

Attorneys for Defendant X Corp.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

WHITE COAT CAPTIONING, LLC, YES CONSULTING, LLC, AUTUMN COMMUNICATIONS, INC., BUSINESS TRAINING WORKS, INC., MEASURING USABILITY LLC, AND FOSTER & FORGE LTD. on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

X CORP. (FORMERLY KNOWN AS TWITTER, INC.),

Defendant.

Case No. 3:23-cv-1594-SK
*Assigned to the Honorable Sallie Kim*

**X CORP.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

DATE: November 9, 2026
TIME: 9:30 a.m.
COURTROOM: Public Zoom Webinar

MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. QUESTIONS PRESENTED ..... 4

III. FACTUAL BACKGROUND ..... 4

A. Twitter's Relevant Financial Controls Regarding Payments to Vendors ..... 4

B. White Coat's Written Agreements and Invoices ..... 6

C. Autumn's Written Agreements and Invoices ..... 6

D. Foster & Forge's Written Agreements and Invoices ..... 7

E. YES's Written Agreements and Invoices ..... 8

F. Business Training's Written Agreements and Invoices ..... 8

G. MeasuringU's Written Agreements and Invoices ..... 9

IV. SUMMARY JUDGMENT STANDARD, GENERALLY ..... 10

V. ARGUMENT ..... 11

A. Judgment Should Be Entered for Twitter on *All* Six Plaintiffs' Claims for Breach of Contract (First Claim for Relief) ..... 11

1. Plaintiffs Cannot Carry Their Burden to Produce Evidence Showing That They Performed Their Contractual Obligations (Second Element of Breach of Contract Claim) ..... 11

2. Alternatively, All Plaintiffs' Materially Breached Their Written Agreements and Thus Cannot Prevail on Their First Claim for Relief (Twitter's Fourth Affirmative Defense) ..... 15

B. Judgment Should Be Entered for Twitter on *All* Six Plaintiffs' Claims for Account Stated (Third Claim for Relief) ..... 18

1. Twitter Never Agreed with Any Plaintiff on an Amount Purportedly Due (Second Element of Account Stated Claim) ..... 18

2. Twitter Never Promised to Pay Any Plaintiff An Amount Purportedly Due (Third Element of Account Stated Claim) ..... 20

3. Plaintiffs' Account Stated Claim Seeks to Impermissibly Restate Their Breach of Contract Claim ..... 20

C. Judgment Should Be Entered for Twitter on *All* Six Plaintiffs' Claims for Open Book Account (Fourth Claim for Relief) ..... 20

1. Twitter Never Expressly Agreed with Any Plaintiff to Be Bound by a Book Account ..... 21

2. All of Plaintiffs' Claims for Book Account Are Duplicative of Their Breach of Contract Claim ....................21

D. Judgment Should Be Entered for Twitter on *All* of White Coat's Four Claims Under the Doctrine of Unclean Hands (Twitter's Seventh Affirmative Defense) ....................22

E. In the Alternative, Partial Judgment Should Be Entered for Twitter on Four of Five Business Training Invoices Because Twitter Has No Obligations Under the Corresponding Contracts (Twitter's Fifth Affirmative Defense) ....................24

VI. CONCLUSION ....................25

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advanced Cleanup Techs., Inc. v. BP Am. Inc.*,
2016 WL 67671 (C.D. Cal. Jan. 4, 2016) .....28

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .....12

*ARB, Inc. v. Luz Const., Inc.*,
972 F.2d 1336 (9th Cir. 1992) .....17

*Biggins v. Wells Fargo & Co.*,
266 F.R.D. 399 (N.D. Cal. 2009) .....29

*Brown v. Grimes*,
192 Cal. App. 4th 265 (2011) .....19

*Bugarin v. All Nippon Airways Co.*,
513 F. Supp. 3d 1172 (N.D. Cal. 2021) ..... *passim*

*Burger v. Kuimelis*,
325 F. Supp. 2d 1026 (N.D. Cal. 2004) .....27

*Callahan v. Ami Adini & Assocs., Inc.*,
2020 WL 1059204 (Cal. Ct. App. Mar. 5, 2020) .....20

*Camp v. Jeffer, Mangels, Butler & Marmaro*,
35 Cal. App. 4th 620 (1995) .....26, 27

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .....12

*Certified Nutraceuticals, Inc. v. Avicenna Nutraceutical, LLC*,
821 F. App'x 701 (9th Cir. 2020) .....27

*City of Chicago v. Reliable Truck Parts Co.*,
822 F. Supp. 1288 (N.D. Ill. 1993) .....20

*City of Hermosa Beach v. Superior Ct.*,
2010 WL 459609 (Cal. Ct. App. Feb. 11, 2010) .....15

*Cohen v. TNP 2008 Participating Notes Program, LLC*,
31 Cal. App. 5th 840 (2019) .....27, 28

*DeRosa v. Transamerica Title Ins. Co.*,
213 Cal. App. 3d 1390 (1989) .....28

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

*Devereaux v. Abbey*,
263 F.3d 1070 (9th Cir. 2001) ....................12

*Dominguez v. Iconiq Cap. Mgmt., LLC*,
2023 WL 3993189 (Cal. Ct. App. June 14, 2023) ....................14

*Durkin v. Durkin*,
133 Cal. App. 2d 283 (1955) ....................25

*Ellenburg v. Brockway, Inc.*,
763 F.2d 1091 (9th Cir. 1985) ....................26

*Emco, Inc. v. Obst*,
2004 WL 1737355 (C.D. Cal. May 7, 2004) ....................27

*Fid. & Deposit Co. of Md. v. Curtis Day & Co.*,
1993 WL 128073 (N.D. Cal. Apr. 21, 1993) ....................18

*Florists' Mut. Ins. Co. v. Floricultura Pac., Inc.*,
2020 WL 6440039 (N.D. Cal. Apr. 3, 2020) ....................29

*Gestion Lican, Inc. v. Good Earthkeeping Org., Inc*.,
2021 WL 6693911 (C.D. Cal. Dec. 21, 2021) ....................24, 25

*Hot Rods, LLC v. Northrop Grumman Sys. Corp.*,
242 Cal. App. 4th 1166 (2015) ....................21

*Hum. Potential Consultants, LLC v. Dep't of Corr. & Rehab.*,
2017 WL 2953689 (Cal. Ct. App. July 11, 2017) ....................19

*Infor Glob. Sols. (Michigan), Inc. v. St. Paul Fire & Marine Ins. Co.*,
2009 WL 5909255 (N.D. Cal. Oct. 21, 2009) ....................28

*Int'l Bhd. of Teamsters v. NASA Servs., Inc.*,
957 F.3d 1038 (9th Cir. 2020) ....................15

*Intamin, Ltd. v. Magnetar Techs. Corp.*,
623 F. Supp. 2d 1055 (C.D. Cal. 2009) ....................27

*Lauth Grp., Inc. v. Sygma Network, Inc.*,
2009 WL 10669362 (C.D. Cal. Mar. 5, 2009) ....................19

*Leighton v. Forster*,
8 Cal. App. 5th 467 (2017) ....................23

*Lies v. Farrell Lines, Inc.*,
641 F.2d 765 (9th Cir. 1981) ....................11

*Long v. Nationwide Legal File & Serve, Inc.*,
2013 WL 5219053 (N.D. Cal. Sept. 17, 2013) ....................29

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

*Martini E Ricci Iamino S.P.A.--Consortile Societa Agricola v. Trinity Fruit Sales Co.*,
30 F. Supp. 3d 954 (E.D. Cal. 2014)....22, 23, 24, 25

*Miramontes v. Mills*,
2015 WL 7566491 (C.D. Cal. Nov. 24, 2015)....25

*MNE Trucking, Inc. v. OJ Com., LLC*,
2026 WL 790893 (C.D. Cal. Mar. 16, 2026)....22, 24

*Mora v. Chem-Tronics*,
16 F.Supp.2d 1191 (S.D. Cal. 1998)....11

*Pac. Bell Directory v. William Muhr, LLC*,
2007 WL 9702830 (C.D. Cal. Mar. 13, 2007)....24, 25

*Platt Pac., Inc. v. Andelson*,
6 Cal. 4th 307 (1993)....15

*Pro. Collection Consultants v. Lujan*,
23 Cal. App. 5th 685 (2018)....21

*Realmuto v. Gagnard*,
110 Cal. App. 4th 193 (2003)....15

*Rivera v. Philip Morris, Inc.*,
395 F.3d 1142 (9th Cir. 2005)....12

*Saks v. Int'l Longshore & Warehouse Union-Pac. Mar. Ass'n Benefit Plans*,
2011 WL 13176423 (C.D. Cal. Jan. 13, 2011)....28

*Sangster v. Paetkau*,
68 Cal. App. 4th 151 (1998)....20

*Tillson v. Peters*,
107 P.2d 434 (1940)....25

*Trombley Enters., LLC v. Sauer, Inc.*,
2019 WL 3804710 (N.D. Cal. Aug. 13, 2019)....25

*Truestone, Inc. v. Simi W. Indus. Park II*,
163 Cal. App. 3d 715 (1984)....22

*United States for Use & Benefit of Bergelectric Corp. v. Sauer, Inc.*,
2019 WL 1746061 (N.D. Cal. Apr. 18, 2019)....22

*United States v. Bestfoods*,
524 U.S. 51 (1998)....25

*Wady v. Provident Life & Accident Ins. Co. of Am.*,
216 F. Supp. 2d 1060 (C.D. Cal. 2002)....25

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

*Wall Street Network, Ltd. v. New York Times Co.*, 164 Cal. App. 4th 1171 (2008) ....11

*Wasco Prods, Inc. v. Southwall techs, Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ....11

*Wheeler v. MGM Resorts Int'l*, 538 F. App'x 772 (9th Cir. 2013) ....25

*whiteCryption Corp. v. Arxan Techs., Inc.*, 2015 WL 3799585 (N.D. Cal. June 18, 2015) ....25

*Willard v. Valley Forge Life Ins. Co.*, 218 F. Supp. 2d 1197 (C.D. Cal. 2002) ....15

**Other Authorities**

4-B at § 5.1 ....8, 16

17 C.J.S. Contracts § 43 (2023) ....29

Fed. R. Civ. P. 56(a) ....11, 12

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

McDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE THAT on November 9, 2026, at 9:30 a.m., via Public Zoom webinar before the Hon. Sallie Kim of the U.S. District Court for the Northern District of California, Defendant Twitter, Inc. ("Twitter")[1] will and hereby does move this Court for summary judgment.

Specifically, Defendant Twitter moves for complete summary judgment on all Plaintiffs'[2] First, Third, and Fourth claims in the operative Second Amended Complaint ("SAC"), and as to all of White Coat's claims in the SAC pursuant to Rule 56. In the alternative, Twitter moves for partial summary judgment on all of Business Training's damages claims seeking to recover for four invoices that were issued pursuant to a contract with an entity that is not a named defendant in this case. Twitter's reasons are more fully set forth in the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

The six Plaintiffs allege that they performed services pursuant to written agreements with Twitter and submitted invoices for those services, but were not paid. SAC, ¶¶ 4–9, 23-67. They each have sued Twitter, seeking payment for the full amounts set forth in those invoices under four legal theories: (1) breach of contract (First Claim for Relief); (2) quantum meruit (Second Claim for Relief); (3) account stated (Third Claim for Relief); and, (4) open book account (Fourth Claim for Relief). *Id.* But all six Plaintiffs want to be paid despite *not* having performed material obligations under their written contracts with Twitter.

Plaintiffs White Coat and Autumn are even suing Twitter to recover expenses that they admitted during discovery they are not entitled to. White Coat went as far as admitting that two of its invoices, including its earliest invoice at-issue here, contain fraudulent charges, intentionally mischaracterized in efforts to evade detection. White Coat and Autumn are nevertheless still suing to recover those amounts. That conduct is emblematic of all Plaintiffs' claims, where Plaintiffs want to hold Twitter to payment obligations that were never triggered due to Plaintiffs not performing myriad

---

[1] Twitter, Inc. existed until May 2023, with X Corp. becoming the successor in interest to Twitter, Inc. Because the allegations at-issue here concern the Defendant when it was known as Twitter, it is referred to herein as "Twitter."

[2] White Coat Captioning ("White Coat"), Foster & Forge ("Foster & Forge"), Measuring Usability ("MeasuringU"), YES Consulting ("YES"), Business Training Works ("Business Training"), and Autumn Communications ("Autumn").

contractual obligations that are conditions precedent to any payment.

Judgment in Twitter's favor is called for on all Plaintiffs' claims for breach of contract (First Claim for Relief). The six Plaintiffs all admit to not complying with material terms of their written agreements, constituting conditions precedent to any obligation on Twitter to pay. Thus, they do not have, and cannot provide, evidence to carry their burden on the second element of a breach of contract claim—that they performed or were justifiably excused from doing so.

Specifically, all six Plaintiffs as sophisticated business entities negotiated and entered into Master Services Agreements ("MSAs") and Statements of Work ("SOWs") with Twitter. All six have provisions in their written agreements requiring that, before they can submit invoices to Twitter, they must obtain Twitter's "Acceptance" of their work, i.e., written acknowledgment that Twitter believes their work was satisfactorily completed under the terms of the contract. Only then can they validly submit invoices to Twitter, which would still need to be approved and accepted for payment by a variety of Twitter personnel. Plaintiffs repeatedly failed to obtain such "Acceptance."

Five Plaintiffs (White Coat, Autumn, YES, Business Training, and MeasuringU) additionally agreed to provisions in their contracts with Twitter, requiring them to submit timesheets to Twitter before payment obligations can be triggered. Two Plaintiffs (White Coat and Autumn), as discussed above, have provisions in their contracts either outright prohibiting the recovery from Twitter of any expenses, or prohibiting the recovery of any expenses in excess of $250 without first obtaining written approval for the proposed expenses. None of those requirements were complied with either.

Those provisions are not immaterial. They are enforceable, bargained-for conditions precedent that serve as part of Twitter's financial controls over vendor payments. Those provisions enabled Twitter to have: its personnel closest to vendor work review and provide written confirmation that the work was performed before vendors could ever submit those invoices into Twitter's accounts payable ("AP") systems; review timesheets to assess if the amount of work done matches what was anticipated and ultimately delivered; and approve or reject vendor requests to incur additional costs. Such contractual rights to control spend go directly to the heart of a vendor relationship. And had they been followed here, they may have led Twitter to catching numerous problems with Plaintiffs' invoices that they seek to recover in this case, ranging from overcharging

on hourly rates, to charging for services outside the scope of the agreements.

These circumstances create two insurmountable hurdles for all Plaintiffs on their breach of contract claim. First, they cannot carry their burden to show performance as required to maintain that claim. They did not comply with the "Acceptance," timesheet, and expense provisions in their agreements that served as conditions precedent to payment, and Twitter was thus never obligated to pay what they seek here. Second, Plaintiffs materially breached their agreements with Twitter (Twitter's Fourth Affirmative Defense), and still cannot recover on their breach of contract claims.

Plaintiffs' common law claims for account stated (Third Claim for Relief) and open book account (Fourth Claim for Relief) fare no better for several reasons. Judgment for Twitter on both of those claims, and as to all Plaintiffs, is called for because those claims are premised on the same written agreements underlying Plaintiffs' claims for breach of contract. As a matter of law, the same written agreement cannot form the basis for a breach of contract claim, on the one hand, and equitable claims for account stated and open book, on the other. California law does not permit Plaintiffs to recast ordinary contract disputes as common law claims without a separate agreement.

Additionally, and as to all Plaintiffs' claims for account stated, Plaintiffs do not, and cannot, provide evidence carrying their burdens to show the second and third elements of that claim. Namely, Plaintiffs have no evidence that Twitter ever acknowledged a sum purportedly owed to any of Plaintiffs, or that Twitter ever promised to pay those amounts. All the evidence shows that Twitter never agreed to any amounts, nor to pay them. Indeed, how could Twitter agree given the range of clearly inappropriate issues with Plaintiffs' invoices, e.g., hiding non-recoverable expenses and overcharging via non-contractual rates?

Moreover, all four of Plaintiff White Coat's claims, in both law and equity, are barred as a matter of law by the doctrine of unclean hands (Twitter's Seventh Affirmative Defense). White Coat's admitted efforts to intentionally defraud Twitter, starting with White Coat's earliest invoice, is plainly inequitable conduct that, if detected, would have resulted in White Coat's relationship being immediately terminated for cause. That conduct also directly relates to the claims White Coat has asserted against Twitter in attempting to recover money associated with those and other, subsequent invoices that White Coat submitted to Twitter. Regardless of what White Coat claims Twitter did,

the law requires that the doors of the Court are closed to White Coat under these circumstances, and judgment should be entered for Twitter on all four of White Coat's claims.

In the alternative, partial judgment is called for in Twitter's favor on Business Training's damages claims to the extent that it seeks to recover $24,000 associated with four of its five invoices at-issue in this case. Those invoices were for services performed under an agreement with Twitter International Unlimited Company ("TIUC"), an Irish entity that is legally separate and distinct from Twitter. Those services were allegedly provided to TIUC, and the four invoices were sent to TIUC. Twitter is not a party to those agreements, nor did Twitter ever offer to pay for those invoices. Business Training cannot carry its burden on any of its claims in the SAC to seek recovery on invoices issued to TIUC, when TIUC is not a party to this case, never has been, and Plaintiffs have never asserted alter ego allegations in any of their three versions of the complaint.

At bottom, this case does not involve vendors who complied with their contractual obligations but were denied payment. It involves vendors seeking payment despite fraudulent conduct and admitted material failures to obtain required approvals, submit required documentation, and secure approval for expenses. Plaintiffs cannot establish essential elements of the claims and the undisputed facts foreclose recovery as a matter of law; summary judgment should be granted for X Corp.

## II. QUESTIONS PRESENTED

1. Whether Plaintiffs have evidence that they performed certain conditions precedent under their written contracts with Twitter (second element of their First Claim for Relief)?

2. Whether Plaintiffs have evidence that Twitter acknowledged a specific sum *and* promised to Plaintiffs to pay it (second and third elements of their Third and Fourth Claims for Relief), that are separate from their written agreements with Twitter?

3. Whether all of Plaintiff White Coat's claims are barred by the doctrine of unclean hands?

4. Alternatively, whether Business Training can recover its four invoices with TIUC?

## III. FACTUAL BACKGROUND

### A. Twitter's Relevant Financial Controls Regarding Payments to Vendors

During the relevant time period, Twitter had financial controls that required vendors, such as

MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

Plaintiffs, to follow steps to get paid. First, with limited exceptions, vendors such as Plaintiffs were required to first obtain written approval from a responsible Twitter business-unit employee ("business owner"), confirming the vendor's work had been completed consistent with the terms of its contract. Hawk Decl., ¶¶ 19-20, Exs. 13 at 20:25–21:16; 14 at 37:10–38:10. Only then, as a second step, could a vendor email its invoice(s) to a designated Twitter AP email inbox, where, as a third step, Twitter's systems would: (1) confirm the invoice corresponded to a valid purchase order ("PO") that Twitter issued; (2) upload the invoice into the "Oracle" software system; (3) use Oracle to route the invoice to assigned business owner(s) *and* manager(s) for review; and, (4) use Oracle to forward the invoice to Twitter's financial compliance team ("FP&A") to verify the invoice aligns with the vendor's contractual terms. *Id.*, ¶ 20, Ex. 14 at 37:5-38:10. Once all steps were completed, Twitter personnel in the finance department could use the Oracle system to issue payment to a vendor for its invoice. *Id.*, ¶ 19, Ex. 13 at 21:4–16.

These financial controls were not merely administrative; they were designed to ensure that payments were made only for work that had been properly performed, documented, and verified in accordance with the parties' agreements, and to protect against improper or unsupported expenditures of corporate funds. *Id.*, ¶ 20, Ex. 14 at 35:23-36:22. Such a process would, for example, help Twitter catch vendors seeking to charge for impermissible or out-of-scope items, charge non-contractual rates, or even seek payment earlier than the vendor is entitled to. *Id.*, ¶ 20, Ex. 14 at 37:19-38:10.

As shown in Twitter's previously-filed opposition to Plaintiffs' motion to certify a class, new leadership learned upon concluding their acquisition of Twitter that these financial controls were not always followed. For example, they learned that some Twitter personnel never actually verified vendors performed services they claimed to have performed, and for which they invoiced Twitter. ECF No. 120 at 11; Hawk Decl., ¶¶ 21, 24-27; Exs. 15 at 58:6-11; 16-A–19. New leadership thus instructed personnel in Twitter's AP department to work with other business units to investigate whether vendors actually provided goods and/or services reflected in invoices they submitted, and to only then propose payment to compliant vendors under the terms of their contracts. *Id.*, ¶ 21, Ex. 15 at 38:14-22. That process resulted in some invoices identified as improper, incorrect, and/or outright fraudulent. *Id.*, ¶¶ 4, 19, 21; Exs. 1 at 66:20–72:15; 13 at 182:22-183:6; 15 at 40:4-8, 58:6-16.

MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

**B. White Coat's Written Agreements and Invoices**[3]

White Coat seeks from Twitter just over $41,000 for services that it claims to have delivered, as set forth in ten (10) invoices. SAC ¶ 23; Hawk Decl., ¶ 5, Exs. 2-D–M.

White Coat's alleged services were performed pursuant to a written MSA and a separate SOW. *Id.*, Exs. 2-A–B. White Coat's MSA and SOW collectively specify, among other things, that White Coat: is to be paid a rate of $170 per hour; cannot seek reimbursement from Twitter for *any* expenses; and, cannot submit an invoice to Twitter until White Coat first obtains written "Acceptance" from Twitter, i.e., "approv[al] in writing by Twitter" personnel that the services were properly provided under the terms of the contract. *Id.*, Ex. 2-B at (§§ 4–5, 4.1, 6.1). Moreover, because White Coat's agreements are based on an hourly billing arrangement, they require White Coat to submit timesheets for Twitter's approval *before* payment would be made. *Id.* § 5.1.

First, White Coat admits it ***knowingly falsified invoices*** at-issue in this litigation. Hawk Decl., ¶ 4, Ex. 1 at 66:20–72:15. White Coat did that on two separate occasions to charge Twitter, all while White Coat knew that those expenses were not permitted under its agreements and would not be paid if Twitter knew their true nature. *Id.*, Ex. 2-D, 2-J. White Coat was intending to engage in the same fraudulent scheme a third time for several thousand dollars more, but stopped short only because the trip was cancelled. *Id.*, ¶ 4, Ex. 1 at 107:13–109:16. Had White Coat's fraud been discovered, it would have been immediately terminated and not paid anything. *Id.*, ¶ 19, Ex. 13 at 186:17-187:7.

Second, White Coat admits it never obtained written "Acceptance" of its work or proposed charges from Twitter personnel *before* submitting any of its invoices. *Id.*, ¶ 4, Ex. 1 at 46:10–19. White Coat also never submitted timesheets to Twitter that would have otherwise enabled Twitter to analyze the amount of work that White Coat claimed it performed and to ensure that amounts being charged were not for, e.g., impermissible travel expenses. *Id.* at 49:20–50:5.

**C. Autumn's Written Agreements and Invoices**

Autumn seeks from Twitter just over $62,000 for services that it claims to have delivered, as

---

[3] The Plaintiffs' contractual failings as set forth below are not their only failings. Those discussed herein are relevant for summary judgment. For the avoidance of doubt, X Corp. is not in any way implying or conceding that Plaintiffs otherwise complied with their written agreements, as they did not, and thus, violated myriad obligations.

set forth in six (6) invoices it submitted. SAC ¶ 44; Hawk Decl., ¶ 7, Exs. 4-C–H.

Autumn's alleged services for Twitter were performed pursuant to a written MSA and a separate SOW. *Id.*, ¶ 7, Exs. 4-A–B. Autumn's MSA and SOW collectively specify, among other things, that Autumn: is to be paid a fixed monthly fee, to be billed once the work is complete; cannot charge Twitter for any expense reimbursements above $250 unless Autumn first obtains approval in writing from Twitter and provides receipts for the expenses; and, cannot submit an invoice to Twitter until it first obtained "Acceptance" as discussed above. *Id.*, ¶ 7, Ex. 4-B at § 5.1. Autumn's agreements also required it to submit timesheets as a prerequisite to payment. *Id.* (§ 6.1).

First, Autumn's invoices seek $10,568.10 in expenses, i.e., an amount equal to 17% of Autumn's total invoices, for which there is no evidence of prior written approval as required under Autumn's agreements. *Id.*, ¶ 7, Exs. 4-E–G. Autumn has, at most, an email that proposes expenses of around $4,000. *Id.*, ¶¶ 6, 10; Exs. 3 at 76:3-80:1; 4-K. Autumn admits that the email does not expressly state that any of the expenses are approved. *Id.*, Ex. 3 at 78:23-79:10. And even assuming *arguendo* that the email did constitute written approval for some expenses (it does not), Autumn admits that it never obtained required approvals for the remaining $6,000+ in expenses that it seeks to recover. *Id.* ("Q: Where does it approve $9,000? A. It doesn't."); 95:24-96:8; 74:13-24.

Second, Autumn never obtained "Acceptance" before submitting any invoices to Twitter, nor did it submit any timesheets with its invoices. *Id.*, ¶ 6, Ex. 3 at 41:4-42:8; 48:25.

Third, Autumn knew when it entered into its agreements that it needed Twitter to issue a PO before it could get paid for any work. *Id.*, Ex. 3 at 61:17-63:12. Autumn started work without that PO in place, and was not paid in part because the PO had not been issued. *Id.* at 90:3-17.

### D. Foster & Forge's Written Agreements and Invoices

Foster & Forge seeks from Twitter 27,900 GBP for services that it claims to have delivered, as set forth in three (3) invoices it submitted. SAC ¶ 65; Hawk Decl., ¶ 12, Exs. 6-F–H.

Foster & Forge's alleged services were performed pursuant to a written MSA and two separate SOWs. *Id.*, ¶ 12, Exs. 6-A–C. Foster & Forge's MSA and SOWs collectively specify, among other things, that Foster & Forge: is to be paid hourly rates set in the agreements; and cannot submit an invoice to Twitter until it first obtains written "Acceptance," i.e., "approv[al] in writing by

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

Twitter" that the services were properly provided. *Id.*, Exs. 6-B–C at (§§ 6.1, 7.1). Notably, Foster & Forge when negotiating its agreements asked Twitter to remove the provision requiring "Acceptance" before an invoice could be submitted, but Twitter refused. *Id.* ¶ 11, Ex. 5 at 49:12-51:9; 105:14–21.

Foster & Forge admits that the language of its agreements with Twitter requires written "Acceptance" before Twitter could be invoiced, but that Foster & Forge never obtained such Acceptance. *Id.*, Ex. 5 at 54:12-55:8, 134:8-12.

**E. YES's Written Agreements and Invoices**

YES seeks from Twitter $49,000 for services that it claims to have delivered, as set forth in three (3) invoices it submitted. SAC ¶ 35; Hawk Decl., ¶ 14, Exs. 8-C–E.

YES's alleged services were performed pursuant to a written MSA and a separate SOW. *Id.*, ¶ 14, Exs. 8-A–B. They collectively specify that YES may not submit an invoice unless and until Twitter provides written "Acceptance" confirming that the deliverables were approved. *Id.* § 5.1. In addition, the SOW requires submission and approval of timesheets as a prerequisite to payment. *Id.*

In particular, YES admits it understood that Twitter needed to "put something in writing" to approve YES's work. Hawk Decl., ¶ 13, Ex. 7 at 60:16–22; 87:14-21, 88:15-90:5, 96:21-102:18. Nonetheless, for one invoice in the amount of $15,500, YES *never* obtained written Acceptance and merely submitted its invoice to Twitter. *Id.* at 104:23-105:20, 106:15-107:2, 109:13–111:11; 8F-8O. YES also admits it never submitted timesheets despite its agreements requiring that. *Id.* at 64:23–25.

**F. Business Training's Written Agreements and Invoices**

Business Training seeks from Twitter $30,000 for services that it claims to have delivered, as set forth in five (5) invoices it submitted. SAC ¶ 55; Hawk Decl., ¶ 17, Exs. 10-F–J.

Business Training's alleged services were performed pursuant to a written MSA and two separate SOWs—one with Twitter, Inc. and another with a legally separate and distinct entity, TIUC, an Irish sister company of Twitter, Inc. *Id.*, ¶ 16, Ex. 10-A–C. TIUC is not, and has never been, a party to this case, and Plaintiffs have never asserted alter ego allegations. As to the SOW with Twitter, it requires Business Training to obtain "Acceptance" before submitting invoices, and to submit timesheets as prerequisites to payment. *Id.*, ¶ 16, Ex. 10-C (§§ 4.1, 5.1).

First, Business Training admits four of its invoices for a total of $24,000, comprising 80% of

the amounts it seeks, were for services performed under its SOW with TIUC, and were purportedly delivered to European personnel within TIUC's organization. *Id.*, ¶ 15, Ex. 9 at 56:18-22. Business Training addressed and sent those four invoices to only TIUC. *Id.*, at 68:20-71:1. Twitter is not a party to that SOW with TIUC, never received that work, and never agreed to pay those invoices for work that was contracted by an entirely different entity that is not a party here. *Id.*, at 77:10-14.

Second, as to the only invoice falling under Business Training's agreement with Twitter, Inc., Business Training admits that it never obtained "Acceptance," and never submitted timesheets as required. Hawk Decl., ¶ 16, Ex. 9 at 49:1-15, 51:11-14.

### G. MeasuringU's Written Agreements and Invoices

MeasuringU seeks from Twitter almost $34,000 for services that it claims to have delivered, as set forth in one (1) invoice it submitted. SAC ¶ 58; Hawk Decl., ¶ 18, Ex. 12-D.

MeasuringU's alleged services were performed pursuant to a written MSA and a separate SOW. *Id.*, Exs. 12-A–B. Those collectively specify that MeasuringU: is to conduct a study of 15 Twitter users; to be paid fixed amounts upon the vendor's completion of milestones identified in the agreement, including providing a final report on a study of Twitter users, containing actionable "recommendations" to Twitter (*Id.*, Ex. 11 at 100:10-17); and, cannot submit an invoice to Twitter until it first obtains written "Acceptance" from Twitter of its work. *Id.* at 12-B (§§ 2.1, 4.1, 5.1). The SOW further requires submission and approval of timesheets as a prerequisite to payment. *Id.* (§ 5.1).

First, MeasuringU's SOW with Twitter, like several discussed above, required Twitter's written "Acceptance" before MeasuringU could submit an invoice. *Id.*, ¶ 18, Ex. 12-B (§ 4.1). MeasuringU agrees it was prohibited under its SOW from submitting an invoice to Twitter until Twitter provided "Acceptance," but interpreted a "thank you" email for a draft report as "Acceptance," as opposed to merely an acknowledgment of receipt, and immediately submitted its invoice at-issue here to Twitter for payment. *Id.*, ¶¶ 17, 19; Exs. 11 at 199:13–20; 12-E.

Second, MeasuringU failed to complete studies of 15 Twitter users that Twitter contracted for, and that were a key component of the services. *Id.* at 261:1-262:11, 263:18-264:5.

Third, MeasuringU delivered a report to Twitter *without* actionable recommendations, which MeasuringU admits is a "legitimate concern," where Twitter personnel had to heavily revise the

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

report and add recommendations themselves. *Id.* at 186:19-187:14, 52:1-7, 53:13-24, 55:3-14, 286:17-22, 287:4-288:19, 292:8-293:8, 295:25-296:14, 298:10-300:4; Exs. 12-F–G.

Fourth, MeasuringU's agreements required it to submit timesheets to Twitter for approval for its work in preparing the report described above. *Id.*, at 119:21-24. MeasuringU never did that, and its internal timesheets for personnel working on Twitter's project—produced only during discovery—reflect significant irregularities, including 24% of the time entries containing no description and some personnel recording 23 hours in a single day. *Id.*, at 150:12-15, 248:3–18.

All of the six Plaintiffs bypassed certain of Twitter's key financial safeguards that were mandatory under their written agreements before they could submit invoices, and they did so while attempting to: overcharge Twitter for non-recoverable expenses (White Coat and Autumn); charge rates higher than those permitted by their agreements and/or for work outside of their contracts' scope (Foster & Forge and YES); charge the wrong legal entity (Business Training); and, charge for work never completed according to the agreement's clear terms (MeasuringU).

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

## IV. SUMMARY JUDGMENT STANDARD, GENERALLY

Rule 56 allows a court to grant complete or partial summary judgment when there is no genuine issue of material fact as to a claim or a portion of that claim. Fed. R. Civ. P. 56(a); *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981). The standards that apply on a motion for summary judgment and a motion for partial summary judgment are the same. *Mora v. Chem-Tronics*, 16 F.Supp.2d 1191, 1200 (S.D. Cal. 1998). Summary judgment, or alternatively partial summary judgment, is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" if a reasonable jury could return a verdict for the nonmovant, and a fact is "material" if it might affect the case's outcome. *Anderson*, 477 U.S. at 248.

The moving defendant bears the initial burden of demonstrating the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden may be satisfied by showing that the plaintiff lacks evidence to support an essential element of its claim, or that the defendant has carried its burden to demonstrate an affirmative defense. *Id.* at 325; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). Once the defendant does so, the burden shifts to the

plaintiff to "go beyond the pleadings" and designate specific facts—through admissible evidence—showing that a genuine issue exists for trial. *Celotex*, 477 U.S. at 324.

This burden is not satisfied by speculation or minimal evidence. "[T]he mere existence of a scintilla of evidence" is insufficient; there must be evidence on which a reasonable jury could find for the plaintiff. *Anderson*, 477 U.S. at 252; *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). Nor can the nonmoving party rely on new theories of liability asserted in response to summary judgment, when the nonmoving party never sought to amend its complaint to add that theory. *Wasco Prods, Inc. v. Southwall techs, Inc.*, 435 F.3d 989, 992 (9th Cir. 2006). Where the nonmoving party fails to carry its burden on an element as to which it bears the burden of proof, "Rule 56 mandates the entry of summary judgment" against that party. *Celotex*, 477 U.S. at 322.

## V. <u>ARGUMENT</u>

### A. Judgment Should Be Entered for Twitter on *All* Six Plaintiffs' Claims for Breach of Contract (First Claim for Relief)

#### 1. Plaintiffs Cannot Carry Their Burden to Produce Evidence Showing That They Performed Their Contractual Obligations (Second Element of Breach of Contract Claim)

To prevail on a claim for breach of contract, a plaintiff must show, among other things, that it performed its obligations or had a valid excuse for nonperformance. *Wall Street Network, Ltd. v. New York Times Co.*, 164 Cal. App. 4th 1171, 1178 (2008); *Dominguez v. Iconiq Cap. Mgmt., LLC*, 2023 WL 3993189, at *3 (Cal. Ct. App. June 14, 2023). Each Plaintiff's breach of contract claim here suffers from the same fatal defect: none can demonstrate that required element, specifically that the Plaintiffs complied with conditions precedent as required by their operative contracts.

"A condition precedent, like a covenant, may be express or implied." *City of Hermosa Beach v. Superior Ct.*, 2010 WL 459609, at *8 (Cal. Ct. App. Feb. 11, 2010); *see also* (b) [§ 800] Express and Implied Conditions., 1 Witkin, Summary 11th Contracts § 800 (2026). "The existence of a condition precedent normally depends upon the intent of the parties as determined from the words they have employed in the contract." *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1043 (9th Cir. 2020) (citing *Realmuto v. Gagnard*, 110 Cal. App. 4th 193, 199 (2003)). No "magic

words" are required to create a condition precedent, but the contract must clearly establish the condition. *Id.* ***Failure of a condition precedent bars recovery as a matter of law***. *See Platt Pac., Inc. v. Andelson*, 6 Cal. 4th 307, 313-14 (1993).

Here, the Plaintiffs' operative agreements impose varying conditions precedent on Plaintiffs that comprise part of Twitter's financial controls, and that Plaintiffs, according to the plain terms of their operative contracts, must satisfy before they can be entitled to any payment. Plaintiffs have not and cannot produce evidence showing that they performed those conditions precedent, and thus they cannot maintain any claim for breach of contract.

**Acceptance:** all six Plaintiffs have agreements requiring that they obtain "Acceptance," i.e., "approv[al] in writing by Twitter" that the services were properly provided, *before* those vendors could submit an invoice to Twitter. Hawk Decl., ¶¶ 5, 8, 13, 15, 17, 19; Exs. 2-B (§ 4.1); 4-B (§ 5.1); 6-B–C at (§ 6.1); 8-B (§ 5.1); 10-C (§ 4.1); 12-B (§ 4.1). Their operative contracts go on to provide that payments are not due until a certain number of days after, among other things, an invoice that is properly submitted is then fully approved for payment by Twitter. *Id.*, ¶¶ 5, 8, 13, 15, 17, 19; Exs. 2-B (§ 5.1); 4-B (§ 6.1); 6-B–C at (§ 7.1); 8-B (§ 6.1); 10-C (§ 5.1); 12-B (§ 5.1).

All six Plaintiffs knew of those contractual preconditions in their agreements with Twitter; they did not bother to comply, i.e., to obtain "Acceptance" before submitting invoices.[4] *Id.*, ¶¶ 4, 7, 12, 14, 16, 18; Exs. 1 at 36:13–17, 46:10-15; 3 at 41:4-14, 42:5-8, 47:22-48:2, 95:2-96:8; 5 at 54:12–55:2; 7 at 60:16-22, 110:18–111:11; 9 at 49:1-15, 49:20-50:2, 51:11-14; 11 at 118:20-119:3[5]).

**Timesheets:** five of the six Plaintiffs—White Coat, Autumn, YES, Business Training, and MeasuringU—have agreements requiring them to submit to Twitter timesheets detailing the work they performed. *Id.*, ¶¶ 5, 8, 15, 17, 19; Exs. 2-B (§ 5.1); 4-B (§ 6.1); 8-B (§ 6.1); 10-C (§ 5.1); 12-B (§ 5.1). None of those Plaintiffs complied with that requirement. *Id.* ¶¶ 4, 7, 14, 17, 18, Ex. 1 at 49:20–50:5; 3 at 48:25; 7 at 64:23-25; 11 at 126:17-19, 150:12-15).

---

[4] Each of these five Plaintiffs except YES failed entirely to obtain "Acceptance," as they admit. YES failed to obtain "Acceptance" for one of its three invoices (no. 113022, for $15,500).

[5] Measuring U will argue that an email from Twitter acknowledging receipt of a version of the report was "Acceptance" of a final work product, but that email cannot be construed in any such way where the email merely thanked MeasuringU for the draft and expressly stated that Twitter will revert with any comments on that draft. Hawk Decl., ¶ 20, Ex. 12-E.



McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

**Expenses:** two Plaintiffs—White Coat and Autumn—have agreements that outright prohibit the recovery of any expenses, or condition the recovery of any expenses above $250 on prior written approval from Twitter and the provision of receipts. Hawk Decl., ¶¶ 5, 8; Ex. 2-B (§ 6.1), 4-B (§ 7.1).

Neither of those Plaintiffs complied with their obligations. White Coat admits that it knew its operative SOW prohibited the recovery of any expenses. It further admits it knew about that contractual prohibition when it submitted its invoices, and for that very reason chose to mischaracterize certain expense entries to conceal them so that they would hopefully get paid by Twitter. *Id.*, ¶ 4, Ex. 1 at 125:7–126:2. Autumn similarly knew that its operative SOW required it to obtain advance written approval from Twitter before incurring any expenses over $250, but failed to get such approval before incurring expenses of $10,568.10. *Id.*, Ex. 3 at 75:10-15, 78:23-79:10.[6]

Under all of the foregoing provisions, the Plaintiffs' operative agreements provide that payment is not due until those preconditions are satisfied. *Id.*, ¶¶ 5, 8, 13, 15, 17, 19; Exs. 2-B (§ 5.1); 4-B (§ 6.1); 6-B–C at (§ 7.1); 8-B (§ 6.1); 10-C (§ 5.1); 12-B (§ 5.1). For example, White Coat's operative SOW provides that "Services and/or Deliverables will be approved in writing by Twitter ('Acceptance')." *Id.*, Ex. 2-B (§ 5.1). It goes on to provide that no invoice can be submitted until White Coat obtains "Acceptance" from the assigned business owner. And only then, after an invoice is properly submitted ***and approved*** via Twitter's internal processes, is payment due 45 days thereafter. *Id.* Similarly, White Coat's agreement provides that "[a]ll time sheets must be approved by Twitter personnel prior to payment." *Id.* The other Plaintiffs' operative agreements are the same. ¶¶ 8, 13, 15, 17, 19; Exs. 4-B (§ 6.1); 6-B–C at (§ 7.1); 8-B (§ 6.1); 10-C (§ 5.1); 12-B (§ 5.1).

These provisions that condition payment upon Plaintiffs satisfying contractual preconditions are legally enforceable. *See ARB, Inc. v. Luz Const., Inc.*, 972 F.2d 1336 (9th Cir. 1992) (condition created where contract required approval of invoices before payment could be dispersed); *see also Bugarin v. All Nippon Airways Co.*, 513 F. Supp. 3d 1172, 1192 (N.D. Cal. 2021) (plain language of

---

[6] As discussed above, Autumn claims that an email *proposing* expenses of around $4,000 constitutes approval from Twitter, but nothing in that email states that the proposed expenses were approved. At most, the email states that Autumn's Twitter contact will discuss internally. Hawk Decl., ¶ 11, Ex. 4-K. And even if that email were an "approval," Autumn still admits that the additional more than $6,000 that it incurred in expenses were *never* approved and thus improper under its agreement with Twitter. *Id.*, Ex. 3 at 78:23-79:10.



McDermott Will & Schulte LLP Attorneys At Law Los Angeles

the parties' agreement created a condition precedent where the agreement mandated that refund payments first required submission of sufficient evidence to prove payment was required). Moreover, their importance cannot be understated.

Provisions requiring "Acceptance" are a key factor in Twitter's financial controls because that enables Twitter business owners to confirm in the first instance that the work was actually done and properly reflected in an invoice before the vendor could email an invoice to Twitter's systems. *Id.*, ¶¶ 21-22, Exs. 13 at 21:4–16; 14 at 37:10–38:10. Vendor timesheets serve a complimentary purpose, in that they allow Twitter to verify that vendors—whether working on an hourly, flat fee, or milestone basis—spent an appropriate amount of time on the work that the vendor projected it would need to spend on the project to complete it for the budget proposed. *Id.*, ¶ 23, Ex. 15 at 114:7-16. And contractual limitations on expenses, unsurprisingly, form another aspect of vendor financial controls to ensure that vendors know what they can charge Twitter for, and the conditions they must satisfy before running up any expense charges. *Id.*, ¶ 21, Ex. 13 at 33:3-22.

Perhaps the best proof of the importance of these contractual provision are the numerous non-contractual charges throughout all six Plaintiffs' invoices that they seek to be paid for here, which may have been flagged as impermissible as part of Twitter's invoice review process had Plaintiffs followed the terms of their agreements. For example, Foster & Forge and YES have submitted invoices with hourly rates above what their contracts allow, and YES's invoices seek to charge for work that is outside the scope of its agreements. Hawk Decl., ¶¶ 12, 14; Ex. 5 at 120:10–14, 125:21-126:18, 131:19-132:2; 7 at 91:8-16. MeasuringU invoiced for a report based on incomplete studies and without recommendations that had to be largely re-written by Twitter personnel. MeasuringU's timesheets—produced only during discovery—reveal anomalies suggesting a half-hearted effort at best that could explain the "legitimate[ly] concern[ing]" work product, including some MeasuringU personnel billing 23 hours in a single day and many personnel's time entries providing no descriptions of their work at all. *Id.*, ¶ 18, Ex. 11 at 178:22-179:7, 180:2-181:21, 187:1-14, 197:17-25, 248:15-18, 284:3-7.

Here, the undisputed evidence shows that each Plaintiff failed to satisfy the mandatory requirements in each of their respective agreements that were preconditions to payment. It follows

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

that, as a matter of law, each of the Plaintiffs failed to perform their contractual obligations and that Twitter is entitled to judgment on each of their claims for breach of contract. *See Willard v. Valley Forge Life Ins. Co.*, 218 F. Supp. 2d 1197, 1201 (C.D. Cal. 2002) (summary judgment for defendant on plaintiff's breach of contract claim where plaintiff failed to satisfy mandatory condition precedent requiring notice of health changes and approval of application before coverage was effective).

**2. Alternatively, All Plaintiffs' Materially Breached Their Written Agreements and Thus Cannot Prevail on Their First Claim for Relief (Twitter's Fourth Affirmative Defense)**

Even assuming *arguendo* that the language of Plaintiffs' written agreements does not establish conditions precedent (although it does), Plaintiffs still—for reasons set forth above, and incorporated herein—materially breached each of their written agreements by failing to obtain "Acceptance" before submitting their invoices, failing to submit timesheets, and seeking to recover expenses that are barred by the express terms of their agreements. *See, e.g.*, *Fid. & Deposit Co. of Md. v. Curtis Day & Co.*, 1993 WL 128073, at *9 (N.D. Cal. Apr. 21, 1993) (where parties' agreement required approval before defendant could issue bonds, failure to secure such approval constitutes breach as a matter of law); *Lauth Grp., Inc. v. Sygma Network, Inc.*, 2009 WL 10669362, at *6 (C.D. Cal. Mar. 5, 2009) (summary judgment to defendant where plaintiff failed to secure contractually required preapproval before payment); *Hum. Potential Consultants, LLC v. Dep't of Corr. & Rehab.*, 2017 WL 2953689, at *5 (Cal. Ct. App. July 11, 2017) (upholding summary judgment where contract required prior approval and plaintiff sought to recover unapproved costs).

Whether a provision is material turns on "the importance or seriousness thereof and the probability of the injured party getting substantial performance." *Brown v. Grimes*, 192 Cal. App. 4th 265, 278 (2011). Nonetheless, the materiality of the provisions discussed above and set forth in Plaintiffs' operative written contracts with Twitter cannot reasonably be disputed, particularly where courts in other cases have recognized that similar provisions are critically important to the contracting parties' relationship, as set forth below.

Contractual terms providing one party with the right to give (or withhold) advanced written approval to its contractual counterparty before that counterparty can incur expenses exist in order to

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

allow the party holding that right to evaluate, control, and authorize expenditures before they are incurred. *Lauth Grp., Inc. v. Sygma Network, Inc.*, 2009 WL 10669362, at *6 (C.D. Cal. Mar. 5, 2009) (granting summary judgment to defendant where plaintiff failed to secure contractually required preapproval before payment); *Hum. Potential Consultants, LLC v. Dep't of Corr. & Rehab.*, 2017 WL 2953689, at *5 (Cal. Ct. App. July 11, 2017) (upholding grant of summary judgment where contract required prior approval and plaintiff sought to recover unapproved costs). Such a contractual provision has been held to constitute a material provision as a matter of law. *Id.* And where a contracting party is asked to provide information necessary to confirm compliance with such a requirement, that party's refusal or failure to provide the requested confirmation acts to defeat an essential contractual safeguard. *See Hum. Potential Consultants,* 2017 WL 2953689, at *5.



Similarly, cost-control provisions in contracts that specify what charges may be invoiced and paid necessarily go to the heart of a services agreement. *Lauth Grp.*, 2009 WL 10669362, at *6 (finding defendant "prevail[ed] on the breach of contract claim as a matter of law" where preapproval of costs was not obtained by plaintiff). Twitter bargained for a contract under which no expenses would be reimbursed. Hawk Decl., Ex. 2-B (§§ 5.1, 6.1).

Further, courts have readily found a party materially breaches its written contract where it knowingly seeks payment for false amounts or charges prohibited by contract. *Callahan v. Ami Adini & Assocs., Inc.*, 2020 WL 1059204, at *11 (Cal. Ct. App. Mar. 5, 2020) (submitting false and misleading invoices to overbill constitutes breach of contract); *Sangster v. Paetkau*, 68 Cal. App. 4th 151, 171 (1998) (evidence a party disguised its own fees through inflated markups on third-party invoices supported a fraud theory that could defeat breach of contract claim); *City of Chicago v. Reliable Truck Parts Co.*, 822 F. Supp. 1288, 1297 (N.D. Ill. 1993) ("submission of false invoices constitutes a material breach of contract" and therefore there was no genuine question of material fact that the claimant was "not entitled to payment on those items").

Here, each of the Plaintiffs had provisions in their written contracts with Twitter that went to the heart of their agreements—i.e., negotiated provisions between sophisticated business entities giving Twitter the right to give (or withhold) approval to submit invoices, to refuse to pay expenses, and to be provided with timesheets that they can approve or reject. Hawk Decl., ¶¶ 4-19; Exs. 1 at

14:3-16, 26:18-27:11, 30:15-31:3, 46:24-47:6; 2-B (§§ 5.1, 6.1); 3 at 19:3-15, 21:12-17, 50:8-12; 4-B (§§ 6.1, 7.1); 5 at 19:8-13, 21:25-22:5, 37:4-38:2, 90:21-91:5; 6-B–C at (§ 7.1); 7 at 21:16-18, 34:15-35:4, 36:22-37:8, 66:8-11; 8-B (§§ 6.1, 7.1); 9 at 14:15-15:9, 104:3-10; 10-C (§§ 5.1, 6.1); 11 at 25:20-25, 27:9-20, 32:2-16; 12-B (§§ 5.1, 6.1). And all of the Plaintiffs materially breached:

- All six Plaintiffs failed to obtain "Acceptance." *Id.*, ¶¶ 4, 7, 12, 14, 16, 18; Exs. 1 at 36:13–17, 46:10-15; 3 at 41:4-42:8, 42:24-43:12; 5 at 54:12–55:2; 7 at 60:16-22, 110:18–111:11; 9 at 49:20-50:5, 49:1-15, 51:11-14; 11 at 118:20-119:3.
- Five of the six Plaintiffs, White Coat, Autumn, YES, Business Training, and MeasuringU, failed to provide timesheets. *Id.*, ¶¶ 4, 7, 14, 17, 18, Exs. 1 at 49:20–50:5; 3 at 48:25; 7 at 64:23-25; 11 at 126:17–19.
- Two Plaintiffs, White Coat and Autumn, attempted to recover non-recoverable expenses, with White Coat intentionally concealing the true nature of its invoice entries. *Id.*, ¶ 4, 8; Ex. 1 at 125:7–126:2; 3 at 75:10-15, 78:23-79:10; 86:4-87:6.

These failings all deprived Twitter of the contractual protections that it bargained for, and that Plaintiffs agreed to give Twitter. They deprived Twitter of, among other things, a first-level financial control in having a Twitter business owner—as the person closest to a vendor's work—be able to review an invoice to confirm if the work was performed and the invoice matches the terms of the contract. They deprived Twitter of being able to compare the work to detailed timesheets that could show if an appropriate amount of time was spent on the projects, including with reference to the amount of time each vendor projected to spend on the work in bidding the project, and with reference to the quality of the work product. They deprived Twitter of being able to identify in invoices impermissible expenses, and non-contractual hourly charges and out-of-scope work.

These failings interfered in a material way with Twitter's contractually-bargained-for rights to oversee vendor expenses. These are material breaches that, as a matter of law, undermine each of Plaintiffs' claims for breach of contract. To find otherwise would be to upend principles of stability and predictability that contracts provide, and allow businesses to entirely disregard key financial control provisions in their agreements to the detriment of their contractual counter-parties, without consequence. *See Hot Rods, LLC v. Northrop Grumman Sys. Corp.*, 242 Cal. App. 4th 1166, 1176

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

(2015) ("Contracts must mean what they say, or the entire exercise of negotiating and executing them defeats the purpose of contract law—predictability and stability.").

### B. Judgment Should Be Entered for Twitter on *All* Six Plaintiffs' Claims for Account Stated (Third Claim for Relief)

An account stated is "an agreement, based on prior transactions between the parties, that the items of an account are true and that the balance struck is due and owing." *Pro. Collection Consultants v. Lujan*, 23 Cal. App. 5th 685, 691 (2018). "When an account stated is assented to…it becomes a new contract"—one that "is not based on the parties' original transactions, but on the new contract under which the parties have agreed to the balance due." *Id.* To prevail, a plaintiff bears the burden on three elements: "(1) previous transactions between the parties establishing the relationship of debtor and creditor; (2) an agreement between the parties, express or implied, on the amount due from the debtor to the creditor; (3) a promise by the debtor, express or implied, to pay the amount due." *MNE Trucking, Inc. v. OJ Com., LLC*, 2026 WL 790893, at *10 (C.D. Cal. Mar. 16, 2026).

Plaintiffs cannot carry their burden on the second or third elements of that claim, and their Third Claim for Relief is also barred as a matter of law as a mere restatement of their contract claims.

#### 1. Twitter Never Agreed with Any Plaintiff on an Amount Purportedly Due (Second Element of Account Stated Claim)

To maintain a claim for account stated, the plaintiff has the burden of providing evidence to show that the parties agreed on the amount at-issue. Indeed, "[b]oth parties must assent to the amount owed in order to create an account stated." *Martini E Ricci Iamino S.P.A.—Consortile Societa Agricola v. Trinity Fruit Sales Co.*, 30 F. Supp. 3d 954, 976 (E.D. Cal. 2014) citations omitted). Moreover, an account stated requires a definite sum "struck and agreed to be correct." *Truestone, Inc. v. Simi W. Indus. Park II*, 163 Cal. App. 3d 715, 725 (1984). By contrast, "where liability had been long and persistently denied, the failure of a person to object to the correctness of a statement of account sent to him does not imply a promise to pay or convert the transaction into an account stated." *Id.*; *see also United States for Use & Benefit of Bergelectric Corp. v. Sauer, Inc*., 2019 WL 1746061, at *7 (N.D. Cal. Apr. 18, 2019) (party entitled to summary judgment on account stated claim where no evidence of an agreement between the parties on the final balance owed).

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

Here, none of the Plaintiffs has ***any*** evidence that Twitter agreed with them to an amount purportedly owed—because Twitter did not. How could Twitter agree to pay them the sums they seek under the circumstances here? Certainly Twitter did not agree to be defrauded by White Coat based on invoices that intentionally concealed and mischaracterized non-recoverable expenses. Nor did Twitter agree to pay White Coat, Foster & Forge or YES for hourly rates that exceeded amounts allowed under the agreements, or for work outside of the scope of their agreements. Hawk Decl., ¶ 11, Exs. 1 at 78:25-80:25; 5 at 120:4-121:1. This is acutely apparent with Autumn, where Twitter contacted Autumn post-acquisition and requested documentation showing that a Twitter business owner had given written "Acceptance," and that Autumn had invoiced the correct amounts when invoices were 20% different from the parties' unsigned agreement stated. Hawk Decl., ¶ 7, Ex. 3 at 124:21-125:19, 126:5-9; 92:22-94:19; 4-I. Autumn provided neither, evidencing that Twitter and Autumn were far from being in agreement. *Maggio*, 196 Cal. App. 3d at 752-53.

Plaintiffs will likely attempt to create a disputed issue of fact by arguing some of them saw in a portal that certain invoices had been "approved." But as the Court has recognized, the "approved" designation—even if some Plaintiffs saw it—was not indicative of Twitter's acceptance of any sum as correct and owing. An invoice that reached "approved" status in Twitter's internal AP process had ***not*** obtained further approvals that Twitter required before payment would be due. ECF No. 147 at 6; Hawk Decl., ¶ 21, Ex. 13 at 20:25-25:24, 55:13-56:4. Twitter's own AP communications confirm the point: when Twitter agreed that an invoice was payable, it said so unmistakably, confirming the invoice was "processed and paid" and supplied a payment-reference number and date. *Id.*, ¶¶ 28-29, Exs. 19-20. In sharp contrast, when Twitter had not fully approved and accepted invoices for payment, it would communicate to vendors that any delay in processing the invoices was based on "the need for 'additional review' of the invoices, despite having already approved them." SAC, ¶ 31.

Put another way, an account that the debtor has placed under "additional review"—while stating only that it does not know whether payment will ever issue—is the opposite of an account stated, which requires the parties to have agreed on a final, correct balance. *See Martini*, 30 F. Supp. 3d at 976. Twitter never agreed with any of Plaintiffs that they were owed any amount, and Plaintiffs cannot satisfy their burden to demonstrate this element of an account stated claim.

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

**2. Twitter Never Promised to Pay Any Plaintiff an Amount Purportedly Due (Third Element of Account Stated Claim)**

Similarly, Twitter never promised to pay any of the Plaintiffs any amount, as needed to maintain an account stated claim. At most, Twitter told some of the Plaintiffs that their invoices were still being reviewed. Hawk Decl., ¶ 4, 12, 14; Exs. 1 at 128:12-18; 5 at 135:11-21; 7 at 114:15-25. Plaintiffs cannot carry their burden to show otherwise, as a statement that an invoice remains under review is not a promise to pay it. If anything it signals the opposite, i.e., that there is no agreement. *See Leighton v. Forster*, 8 Cal. App. 5th 467, 493 (2017) ("failure to pay appellant's $114,000 bill was further notice that appellee did not agree that she incurred such a debt.").

**3. Plaintiffs' Account Stated Claim Seeks to Impermissibly Restate Their Breach of Contract Claim**

"Under California law, a debt which is predicated upon the breach of the terms of an express contract cannot be the basis of an account stated." *MNE Trucking*, 2026 WL 790893, at *10 (collecting cases). "An account stated constitutes a new contract which supersedes and extinguishes the original obligation." *Martini*, 30 F. Supp. 3d at 976. That is precisely the case here. No Plaintiff can, or does, identify any later, separate contract. They merely point to the written agreements underlying their breach of contract claims, and seek the same amounts from their invoices. That is not sufficient; finding otherwise would "elevate[] form in pleading over substance," upending California law to enable the same written agreement to impermissibly serve as the basis of a breach of contract claim *and* an account stated claim. That cannot be. Plaintiffs cannot carry their burden.

**C. Judgment Should Be Entered for Twitter on *All* Six Plaintiffs' Claims for Open Book Account (Fourth Claim for Relief)**

"A book account is a detailed statement of debit/credit transactions kept by a creditor in the regular course of business, and in a reasonably permanent manner." *Gestion Lican, Inc. v. Good Earthkeeping Org., Inc.*, 2021 WL 6693911, at *4 (C.D. Cal. Dec. 21, 2021) (citing C.C.P. § 337a). Money "due under an express contract cannot be recovered in an action on an 'open book account' in the absence of a contrary agreement between the parties. . . . The 'mere incidental keeping of accounts does not alone create a book account.'" *W. Fresh Mktg. Servs., Inc.*, 54 F. Supp. 3d at 1109.

MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

**1. Twitter Never Expressly Agreed with Any Plaintiff to Be Bound by a Book Account**

Plaintiffs have "the burden of pointing to some statement or conduct on [Twitter's] part that creates a triable issue of fact as to whether there was an agreement for utilizing an open book account." *Pac. Bell Directory v. William Muhr, LLC*, 2007 WL 9702830, at *13 (C.D. Cal. Mar. 13, 2007). A written agreement on which a breach of contract claim is already based is insufficient, as is the mere existence of invoices issued under such written agreements. *See id.* ("[N]o documents have been produced that would fit the description of a book account. ***The most that is before the Court is a series of invoices, which is insufficient.***") (emphasis added); *see also Miramontes v. Mills*, 2015 WL 7566491, at *9 (C.D. Cal. Nov. 24, 2015) ("[T]he invoices merely list the number of times each year Miramontes performed services for Mills. Thus, at most, the invoices are a compilation of other records, and no reasonable jury could construe them as Miramontes' original customer billing records or a running ledger of the account.").

Plaintiffs here offer no evidence to carry their burden. *See id* (granting summary judgment where the plaintiff failed to bring forth any evidence of an agreement). Rather, the facts in this case are similar to those in *Martini*. There, the court found that while it was clear there was an express consignment agreement between the parties there was "no evidence that the parties ever agreed to be bound by a book account[,]" and without evidence of such an agreement "reliance on the parties' consignment agreement alone is insufficient." 54 F. Supp. 3d at 1108.

The same is true here. Plaintiffs identify only their written agreements with Twitter that form the bases for their breach of contract claims. No evidence supports any notion that the parties entered into separate agreements to create any book account, and Plaintiffs thus cannot carry their burden to maintain their Fourth Claim for Relief. *Trombley Enters., LLC v. Sauer, Inc.*, 2019 WL 3804710, at *8 (N.D. Cal. Aug. 13, 2019) (summary adjudication on open book claim; accepting the defendant's argument that the claim failed because the parties did not agree to be bound by an open book account).

**2. All of Plaintiffs' Claims for Book Account Are Duplicative of Their Breach of Contract Claim**

"An express contract, which defines the duties and liabilities of the parties, whether it be oral

or written, is not, as a rule, an open account." *Gestion Lican, Inc.*, 2021 WL 6693911, at *4 (citing to *Durkin v. Durkin*, 133 Cal. App. 2d 283, 290 (1955)) (internal quotation marks omitted); *see also Tillson v. Peters*, 107 P.2d 434, 437 (1940) ("We think that plaintiff's attempt to recover by alleging an open book account when his right of action is based upon the terms of an express contract ought not to be allowed."). That is the case here.

The SAC simply incorporates by reference paragraphs preceding each of the claims, which is exactly what it does for its breach of contract claims. *See* SAC, ¶ 84. The SAC goes on to allege Plaintiffs kept accounts of "the debits and credits" and that "Twitter has not paid any portions of the invoices[.]" SAC ¶¶ 85-86. The core of these allegations is no different than Plaintiffs' breach of contract claims in which Plaintiffs seek payment on invoices derived from written contracts.

Fact discovery did not reveal anything to the contrary. Indeed, deposition testimony from the Plaintiffs confirms that the parties' relationship was based upon express contracts and the recovery they seek is based upon those written agreements with Twitter. *See, e.g.*, Hawk Decl., ¶¶ 4, 7, 12, 14, 16, 18; Exs. 1 at 30:6-9; 39:3-41:19 (agreeing that contract dictates payment and invoicing); 3 at 38:7-39:9 (same); 5 at 30:19-31:7 (confirming alleged work was performed pursuant to a master services agreement and statements of work); 7 at 51:17-52:21 (same); 9 at 46:1-24 (same); 11 at 200:10-21 (testifying whether Twitter accepted service per a statement of work). It follows that there can be no genuine dispute of material fact that Plaintiffs' claims for open book account (Fourth Claim for Relief) are impermissibly based upon the terms of express contracts, that express contracts are not open books, and that judgment should be entered for Twitter on these claims as well.

**D. Judgment Should Be Entered for Twitter on *All* of White Coat's Four Claims Under the Doctrine of Unclean Hands (Twitter's Seventh Affirmative Defense)**

The unclean hands doctrine "rests on the maxim that 'he who comes into equity must come with clean hands.'" *Camp v. Jeffer, Mangels, Butler & Marmaro*, 35 Cal. App. 4th 620, 638 (1995) (quoting *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985)). Unclean hands is an affirmative defense that applies to both legal and equitable claims and can be a complete bar to a plaintiff's recovery, no matter how "improper may have been the behavior of the defendant." *Id.*; *Cohen v. TNP 2008 Participating Notes Program, LLC*, 31 Cal. App. 5th 840, 872 (2019); *see also*



McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

*Burger v. Kuimelis*, 325 F. Supp. 2d 1026, 1040 (N.D. Cal. 2004) ("[t]he unclean hands doctrine 'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.'").

To carry its burden to demonstrate unclean hands, "[f]irst, a defendant must prove the plaintiff engaged in inequitable conduct and, second, that the plaintiff's conduct directly relates to the claim which it has asserted against the defendant." *Intamin, Ltd. v. Magnetar Techs. Corp.*, 623 F. Supp. 2d 1055, 1074 (C.D. Cal. 2009); *Emco, Inc. v. Obst*, 2004 WL 1737355, at *4 (C.D. Cal. May 7, 2004) (same). Here, Twitter has carried its burden to establish both requirements.

First, White Coat has unequivocally admitted its inequitable conduct, i.e., that it knowingly attempted to charge Twitter for what White Coat knew were impermissible expenses under its agreements. White Coat also knowingly attempted to hide those charges by intentionally mislabeling them in its invoices because White Coat knew they would not be paid if those charges were accurately described. Hawk Decl., ¶ 4, Ex. 1 at 66:20–72:15. White Coat's owner went as far as to refer to her employee a "clever girl" and "brilliant" in an internal email for intentionally mischaracterizing those expenses in efforts to avoid detection by Twitter. *Id.* at 125:7-20; Ex. 2-N. White Coat planned to run the same scam a third time, but the project was cancelled. *Id.*, Ex. 1 at 109:11-16.

White Coat's fraudulent charges start in the earliest invoice that White Coat seeks to recover in this litigation, i.e., invoice number 5438, dated September 21, 2022. *Id.*, ¶ 5, Ex. 2-D. Had that fraud been caught, White Coat would have been terminated as a vendor, that invoice would not have been paid, and none of White Coat's other invoices in this case ever would have been submitted, let alone paid. *Id.*, ¶ 21, Ex. 13 at 186:17–187:7.

White Coat's fraud attempts are unequivocally inequitable conduct in the context of an unclean hands defense. *Certified Nutraceuticals, Inc. v. Avicenna Nutraceutical, LLC*, 821 F. App'x 701, 703 (9th Cir. 2020) (district court properly granted summary on unclean hand doctrine where the plaintiff knowingly made false statements about the patented nature of its product); *see also DeRosa v. Transamerica Title Ins. Co.*, 213 Cal. App. 3d 1390, 1397 (1989).

Second, White Coat's improper conduct "directly relates to" its claims, where White Coat seeks to recover not only the invoices setting forth its fraudulent charges, but also invoices submitted

MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

subsequently as part of a relationship that would have been terminated had White Coat been caught earlier. Perhaps White Coat would have been caught earlier had it followed its contractual obligations to obtained "Acceptance" before submitting any invoice, and to submit timesheets detailing its charges. Regardless, White Coat's claims are all premised on invoices submitted to Twitter as part of a business relationship that never would have continued past its first fraudulent invoice.

Based on these facts, the doctrine of unclean hands serves as a bar to *each* of White Coat's four claims asserted here. *Infor Glob. Sols. (Michigan), Inc. v. St. Paul Fire & Marine Ins. Co.*, 2009 WL 5909255, at *2 (N.D. Cal. Oct. 21, 2009) (unclean hands applicable to claims at law); *Cohen*, 31 Cal. App. 5th at 872 (unclean hands applicable to breach of contract claim); *Saks v. Int'l Longshore & Warehouse Union-Pac. Mar. Ass'n Benefit Plans*, 2011 WL 13176423, at *4 (C.D. Cal. Jan. 13, 2011) (applicable to quasi or implied contract claims); *see also Advanced Cleanup Techs., Inc. v. BP Am. Inc.,* 2016 WL 67671, at *7 (C.D. Cal. Jan. 4, 2016) (dismissing open book account and account stated claims where gravamen of claims was contractual relationship). Judgment should be entered for Twitter and against White Coat on each and every one of White Coat's claims pursuant to Twitter's Seventh Affirmative Defense of unclean hands. *See Pond*, 151 Cal. App. 3d 290–292 (summary judgment appropriate when plaintiff's "violation of principles of good faith and good conscience" including knowing "nondisclosures and misrepresentations" infect the cause of action).

**E. In the Alternative, Partial Judgment Should Be Entered for Twitter on Four of Five Business Training Invoices Because Twitter Has No Obligations Under the Corresponding Contracts (Twitter's Fifth Affirmative Defense)**

All of Business Training's claims in this case seek to recover five invoices, totaling $30,000, based on its contractual relationship with Twitter. Hawk Decl., ¶ 17, Exs. 10-F–J. But four of those invoices, totaling $24,000, were issued pursuant to an SOW and PO between Business Training and TIUC, *not* Twitter. *Id.*, ¶ 17, Exs. 10-B, 10-D. They were for services rendered to personnel in TIUC's organization, *not* Twitter's. *Id.*, ¶ 16, Ex. 9 at 56:18-22, 61:17-22. Business Training addressed and sent them to TIUC for payment, *not* to Twitter. *Id.* at 68:20-71:16. And Business Training has admitted that Twitter, Inc. made no promise to pay TIUC's obligations. *Id.* at 77:10-14.

TIUC is an entity legally separate and distinct from Twitter. *Id.*, ¶ 29, Exs. 21-A–B. It has

never been a named defendant here, and Plaintiffs have never asserted any alter ego allegations. SAC ¶ 19. Business Training's claims seeking to have Twitter pay those four invoices to TIUC thus fail as a matter of black-letter law—one who is "not a party to a contract cannot be liable on the contract." 17 C.J.S. Contracts § 43 (2023). Indeed, corporate affiliation alone does not establish liability. *Florists' Mut. Ins. Co. v. Floricultura Pac., Inc.*, 2020 WL 6440039, at *3 (N.D. Cal. Apr. 3, 2020) ("That companies are affiliated is not, by itself, a basis for imposing joint liability."). Absent a recognized exception—such as alter ego—a parent corporation is not liable for its subsidiary's acts. This principle is "deeply ingrained in our economic and legal systems." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). Accordingly, courts impose such liability only in exceptional circumstances that are not present here. *See whiteCryption Corp. v. Arxan Techs., Inc.*, 2015 WL 3799585, at *2 (N.D. Cal. June 18, 2015); *Biggins v. Wells Fargo & Co.*, 266 F.R.D. 399, 414 (N.D. Cal. 2009); *Wheeler v. MGM Resorts Int'l*, 538 F. App'x 772 (9th Cir. 2013).

Where, as here, Twitter is a legally distinct entity and not a party to the operative contract, and Business Training has not pleaded, and offers no evidence of, alter ego or other derivative liability, partial summary judgment is warranted in Twitter's favor against Business Training's claims seeking to recover those four invoices totaling $24,000 (nos. 6997, 6736-6738). *Long v. Nationwide Legal File & Serve, Inc.*, 2013 WL 5219053, at *7 (N.D. Cal. Sept. 17, 2013) (summary judgment where defendant could not be liable for the acts of an affiliate absent evidence of alter ego or joint venture); *Wady v. Provident Life & Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060, 1067 (C.D. Cal. 2002) (plaintiff could not avoid summary judgment via unpleaded alter ego theory ).

## VI. CONCLUSION

For the reasons set forth above, Plaintiffs do not and cannot illustrate that there is a genuine issue of material fact as to any of their claims and summary judgment, or in the alternative partial summary judgment, should be granted as set forth above.

Dated: July 13, 2026 **MCDERMOTT WILL & SCHULTE LLP**

By: */s/ J. Jonathan Hawk*
J. JONATHAN HAWK
Attorneys for Defendant X Corp.

MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES